[S.F. No. 23711. Apr. 24, 1979.]

RALPH RUBIO, Petitioner, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Paul Halvonik, Quin Denvir, State Public Defenders, Gary S. Goodpaster, Ezra Hendon, Chief Assistant State Public Defenders, Mark L. Christiansen, Richard Shapiro and Stephen Berlin, Deputy State Public Defenders, for Petitioner.

Richard M. Pearl, Albert H. Meyerhoff, Neil Gotanda, Marion Standish, Ronald Vera, Peter Schey and Tomas Olmos as Amici Curiae on behalf of Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi, Edmund D. McMurray and Willard F. Jones, Deputy Attorneys General, for Respondent and for Real Party in Interest.

## OPINION

**MOSK, J.**—Defendant Rubio is charged in respondent ·San Joaquin Superior Court with one count of murder. He moved to quash the petit jury venire on the ground that it contains neither ex-felons nor resident aliens, such persons being excluded by statute from jury service.[1] This exclusion, he contended, denies him his constitutional right to be tried by a jury drawn from a representative cross-section of the community, as well as due process and equal protection of the laws.

The parties stipulated to certain facts: e.g., that the offense occurred at Deuel Vocational Institution, where defendant is presently incarcerated;[2] that defendant is a convicted felon "of Mexican descent"; and that

---

[1] Code of Civil Procedure section 198 declares in part that a person is competent to be a juror if he is "A citizen of the United States."

Code of Civil Procedure section 199 provides in part that "A person is not competent to act as a trial juror if any of the following apply:

"(a) The person does not possess the qualifications prescribed by Section 198.

"(b) The person has been convicted of malfeasance in office or any felony or other high crime."

Penal Code section 1072 lists "A conviction of felony" among the permissible grounds for a challenge of a prospective juror for cause.

We note that in the Jury Selection and Service Act of 1968 the Congress likewise excluded aliens and ex-felons from service on federal juries. (28 U.S.C. § 1865(b)(1) & (b)(5).)

[2] Deuel Vocational Institution is a medium-security correctional facility for "mature" youths. (Pen. Code, § 2036.)

pursuant to the cited statutes the jury commissioner routinely excludes all ex-felons and resident aliens from the master list of jurors in San Joaquin County.[3] The trial court denied the motion to quash the venire, finding that neither ex-felons nor resident aliens constitute a cognizable group within the meaning of the representative cross-section requirement.

Defendant now petitions for a writ of prohibition to review that ruling prior to trial. Because of the seriousness of the pending charge and the desirability of trying it before a properly selected jury, we agree that appeal from the final judgment is an inadequate remedy and the petition is proper. (*Ganz* v. *Justice Court* (1969) 273 Cal.App.2d 612, 617-618 [78 Cal.Rptr. 348].) On the merits, however, we conclude that the challenged statutes are constitutionally valid and hence that defendant is not entitled to relief.

I

In our recent decision in *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], we held that in state criminal prosecutions the right to trial by a jury drawn from a "representative cross-section of the community" is guaranteed equally and independently by the Sixth Amendment to the federal Constitution and by article I, section 16, of the California Constitution, and that such right is violated when a "cognizable group" within the community is systematically excluded from jury service. (*Id.* at p. 272.) Because there was no doubt that the blacks excluded in *Wheeler* were such a group, we had no occasion to further define what constitutes a cognizable group within the meaning of the representative cross-section rule. (*Id.* at p. 280, fn. 26.)

That process of definition, however, began in *Adams* v. *Superior Court* (1974) 12 Cal.3d 55 [115 Cal.Rptr. 247, 524 P.2d 375]. The court there stated that "before exclusion may be held improper, there must be a common thread running through the excluded group—a basic similarity

---

[3]In addition, the parties stipulated to certain figures concerning the number of resident aliens in California and in San Joaquin County, and the number of ex-felons released from prison or discharged from parole during several recent years. The figures are neither current nor complete; and in the view we take of the case, they are also irrelevant.

In his motion defendant complained of the exclusion of all "resident non-citizens." We assume defendant asserts his claim only as to resident aliens in order to distinguish them from visiting aliens and illegal aliens. Yet if we were to declare invalid the legislative restriction of jury service to citizens, it would be difficult to grant relief to one category of aliens while denying it to others. The Constitution (art. I, § 7, subd. (a); see also U.S. Const., 14th Amend.) declares only that "a person" shall not be deprived of equal protection of the laws.

of attitudes, ideas or experience among its members so that the exclusion prevents juries from reflecting a cross-section of the community." (*Id.* at p. 60.) Two requirements must thus be met in order to qualify an asserted group as "cognizable" for purposes of the representative cross-section rule. First, its members must share a common perspective arising from their life experience in the group, i.e., a perspective gained precisely *because* they are members of that group. It is not enough to find a characteristic possessed by some persons in the community but not by others; the characteristic must also impart to its possessors a common social or psychological outlook on human events. For example, in *Adams* the claimed cognizable group was composed of all persons who had resided in the community for less than one year; at any given moment the members of that group could be identified with certainty and thereby distinguished from all other persons in the community, but a majority of this court held that they had not acquired a true "commonality of interest" merely by virtue of the brevity of their residence.[4]

Such a unifying viewpoint, however, is a necessary but not a sufficient condition for qualifying a group as "cognizable." The party seeking to prove a violation of the representative cross-section rule must also show that no other members of the community are capable of adequately representing the perspective of the group assertedly excluded. This is so because the goal of the cross-section rule is to enhance the likelihood that the jury will be representative of significant community *attitudes,* not of groups per se. When a "cognizable group" is defined too narrowly, it may duplicate another group in the community with a similar experience and viewpoint. Yet if the members of the latter are permitted to serve on juries, even a total exclusion of the former will not impair the representativeness in fact of the list. As the court explained in *Taylor* v. *Louisiana* (1975) 419 U.S. 522, 538 [42 L.Ed.2d 690, 702, 95 S.Ct. 692], "The fair-cross-section principle must have much leeway in application. The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community."

■ Turning to the case at hand, we find that the first requirement of the foregoing analysis is satisfied. Ex-felons as a whole have had the experience of being deprived of their personal liberty by the state and, upon their return to the community, of being stigmatized both publicly and privately because of their former status. Similarly, resident aliens as a

---

[4]In its first session after the decision of this court in *Adams* the Legislature repealed the one-year residence requirement for jurors. (Stats. 1975, ch. 172, § 1, p. 317.)

whole have had the experience of being excluded from the political processes of this nation by its government, and of being the victims of both official and unofficial discrimination by its citizenry. In each instance these experiences have tended to unify the group by giving its members a shared perspective on life in our society.

The Attorney General contends, however, that neither group qualifies because it is heterogeneous in all other respects: its membership cuts across racial, religious, sexual, economic, social, and occupational lines. The argument is fallacious, and proves too much: it could equally well be applied to the women excluded in *Taylor* v. *Louisiana, supra,* the blacks excluded in *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163], and our decision in *Wheeler,* and the daily wage earners excluded in *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412]. In each case the group was likewise heterogeneous in all respects save one—but that one, as here, imparted to its members a shared viewpoint that could not be excluded from the master jury list without impairing its representativeness. Indeed, the Attorney General's contention has already been refuted in *Wheeler*: in suggesting ways in which a party may prove that prospective jurors are being removed because of their group association, we said it may be shown that such jurors "share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole." (22 Cal.3d at p. 280.)[5]

Nevertheless, we conclude that defendant's claim of a violation of the representative cross-section rule must ultimately fail because he cannot satisfy the second requirement of the "cognizable group" test: it cannot be shown that no other members of the community adequately represent the particular viewpoints of ex-felons and resident aliens. As to the former group, several classes of persons eligible for jury service have had similar experiences of loss of personal liberty followed by social stigmatization. Foremost among these are all convicted misdemeanants who have served time in county jail: the number of such persons in the community is larger than the number of ex-felons who have been incarcerated, and in cases of recidivism or consecutive sentences (Pen. Code, § 19a) their cumulative periods of imprisonment may be no less substantial. Other such groups are comprised of all persons who have been confined as youthful offenders in the custody of the Youth

---

[5]In a footnote at this point (p. 280, fn. 27) we gave the following illustration, equally relevant here: "in a case of alleged exclusion on the ground of race, it may be significant if the persons challenged, although all black, include both men and women and are of a variety of ages, occupations, and social or economic conditions."

Authority,[6] or have spent periods of involuntary commitment in state mental institutions.[7]

The same is true of resident aliens. Their exclusion from the political process and their exposure to discrimination have also been experienced by another group in our society: naturalized citizens. This class rivals resident aliens in numbers;[8] yet the vast majority of naturalized citizens were once resident aliens themselves, and were required to spend "at least five years" in that status. (8 U.S.C. § 1427(a).) Throughout such period, they shared both the disabilities and the resulting outlook of today's resident aliens. Indeed, the discrimination against them was more pervasive, at least on the official level: it is only in recent times that many longstanding restrictions on aliens' access to educational and social benefits, to employment in the public sector, and to the licensed professions have been struck down by the courts[9] or repealed by the Legislatures.[10] These are memories not soon forgotten, and many naturalized citizens still carry with them the deep imprint of their former status. Between them and resident aliens, in this respect, there may be differences of degree but not of kind.

For the foregoing reasons ex-felons and resident aliens are not cognizable groups within the meaning of the representative cross-section rule, and the trial court was correct in so ruling.

[6]Such persons may even be transferred to Deuel Vocational Institution, the very facility in which defendant and other convicted felons are incarcerated. (Pen. Code, § 2037.)

[7]At least one of the latter, Atascadero State Hospital, is a maximum-security institution that has been described by various studies as more like a prison than a medical facility. (See *People* v. *Burnick* (1975) 14 Cal.3d 306, 319-320 & fn. 11 [121 Cal.Rptr. 488, 535 P.2d 352].)

[8]In the year 1976 a total of 4,776,000 registered aliens reported their presence in the United States, as required by law. (8 U.S.C. § 1305.) Naturalized citizens, of course, are not required to so report; but an estimate of their number in this country can be inferred from the fact that since 1930, for example, a total of 6,625,000 persons have been granted the status of naturalized citizens. (Statistical Abstract of U.S. (98th ed. 1977) tables 130 & 131, p. 89.)

[9]See, e.g., *Nyquist* v. *Mauclet* (1977) 432 U.S. 1 [53 L.Ed.2d 63, 97 S.Ct. 2120] (financial assistance for higher education); *Examining Board* v. *Flores de Otero* (1976) 426 U.S. 572 [49 L.Ed.2d 65, 96 S.Ct. 2264] (license to practice as civil engineer); *Hampton* v. *Mow Sun Wong* (1976) 426 U.S. 88 [48 L.Ed.2d 495, 96 S.Ct. 1895] (employment in federal civil service); *Sugarman* v. *Dougall* (1973) 413 U.S. 634 [37 L.Ed.2d 853, 93 S.Ct. 2842] (employment in state civil service); *In re Griffiths* (1973) 413 U.S. 717 [37 L.Ed.2d 910, 93 S.Ct. 2851] (practice of law); *Graham* v. *Richardson* (1971) 403 U.S. 365 [29 L.Ed.2d 534, 91 S.Ct. 1848] (welfare benefits); *Raffaelli* v. *Committee of Bar Examiners* (1972) 7 Cal.3d 288 [101 Cal.Rptr. 896, 496 P.2d 1264, 53 A.L.R.3d 1149] (practice of law); *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194] (employment in public works).

[10]See, e.g., Statutes of 1972, chapters 1204, 1285; Statutes of 1970, chapters 652, 653.

## II

Defendant next contends that the statutory exclusion of ex-felons and aliens from jury service violates the equal protection clauses of the United States and California Constitutions. As will appear, the contention fails on several grounds.

■ We begin with the exclusion of ex-felons. Defendant does not claim that the classification is "suspect," and *Adams* held (at p. 61 of 12 Cal.3d) that jury duty is not a "fundamental right." It follows that the exclusion does not violate equal protection if it has any rational relationship to some legitimate state objective. (*Id.* at p. 62.)[11]

In the case at bar the objective of the legislation is evidently to protect the right to trial by an impartial jury. The latter right is expressly guaranteed by the Sixth Amendment; and in *Wheeler* we held it is no less implicitly guaranteed by the declaration of article I, section 16, of the California Constitution that " 'Trial by jury is an inviolate right and shall be secured to all.' " (22 Cal.3d at p. 265.)

The present exclusion bears a rational relationship to that objective. The Legislature could reasonably determine that a person who has suffered the most severe form of condemnation that can be inflicted by the state—a conviction of felony and punishment therefor—might well harbor a continuing resentment against "the system" that punished him and an equally unthinking bias in favor of the defendant on trial, who is seen as a fellow underdog caught in its toils. Because these antisocial feelings would often be consciously or subconsciously concealed, the Legislature could further conclude that the risk of such prejudice infecting the trial outweighs the possibility of detecting it in jury selection proceedings. The exclusion of ex-felons from jury service thus promotes the legitimate state goal of assuring impartiality of the verdict. (See *United States* v. *Test* (10th Cir. 1976) 550 F.2d 577, 594; *United States* v. *Armsbury* (D.Ore. 1976) 408 F.Supp. 1130, 1134; *United States* v. *Arnett* (D. Mass. 1970) 342 F.Supp. 1255, 1261.)

Defendant contends, however, that the classification is overinclusive because it assertedly bars from service some ex-felons who would not in fact be biased jurors, and that it is not necessary to protect the integrity of

[11]For the same reason there is no merit in defendant's alternative contention that the exclusion of ex-felons from jury duty violates due process of law because it assertedly creates a conclusive statutory presumption against the exercise of a "fundamental right."

the jury system because of other statutory provisions guaranteeing juror competency (Code Civ. Proc., §§ 198, subds. 2 & 3, 205, subd. (a)) and probity (Pen. Code, §§ 93, 96) and the right of voir dire and challenge (Pen. Code, § 1055 et seq.). As authority defendant relies principally on our decision in *Otsuka* v. *Hite* (1966) 64 Cal.2d 596 [51 Cal.Rptr. 284, 414 P.2d 412].

The citation betrays the flaw in the argument. *Otsuka* dealt with a former California constitutional provision depriving persons convicted of an "infamous crime" of the right to vote. We held that suffrage was a "fundamental right" triggering a strict scrutiny analysis, i.e., that the state was required to show that it had a compelling interest in abridging the right and that any limitation thereof was drawn with narrow specificity. (*Id.* at p. 602.)[12] As we explain above, however, jury duty is not a "fundamental right" and any restriction thereof is to be judged by the rational relationship standard. Under that standard the exclusion of ex-felons is a permissible legislative response to the problem of juror bias even though it is arguably imprecise and to some extent duplicates other statutory solutions.[13] We do not, of course, weigh the wisdom of this legislation.

Defendant cites *Otsuka* for still another purpose, but again the reliance is misplaced. He contends that the Legislature exceeded its authority in excluding *all* ex-felons from jury service because a provision of the state Constitution requires only that some ex-felons be so excluded. The provision in question is subdivision (b) of section 8, article VII, which declares in relevant part that "Laws shall be made to exclude persons convicted of bribery, perjury, forgery, malfeasance in office, or other high crimes from office or serving on juries." In *Otsuka* we had occasion to address the same language when it also barred the right of suffrage and appeared in a predecessor section of the Constitution. (Former art. XX, § 11.) We reasoned (at p. 608 of 64 Cal.2d) that "It would seem that under the rule of construction *ejusdem generis,* the term 'high crimes' should be deemed to refer to criminal conduct evidencing the kind of moral

---

[12]The latter requirement was thereafter tightened to provide that any such limitation must be "necessary" to promote the state interest and the "least burdensome" alternative possible. (*Ramirez* v. *Brown* (1973) 9 Cal.3d 199, 207-211 [107 Cal.Rptr. 137, 507 P.2d 1345]; revd. on other grounds *sub nom. Richardson* v. *Ramirez* (1974) 418 U.S. 24 [41 L.Ed.2d 551, 94 S.Ct. 2655], dism. as moot (1974) 12 Cal.3d 912 [117 Cal.Rptr. 562, 528 P.2d 378].)

[13]In a sense it is more precise than the restriction on suffrage involved in *Otsuka*: surely an ex-felon's experience of incarceration is more likely to affect his deliberations as a juror than his vote as an elector.

corruption and dishonesty inherent in the listed offenses of 'bribery, perjury, forgery, malfeasance in office.' "

We adhere to that view, but it is not dispositive of the issue before us now. The constitutional provision does not purport to be an exclusive list of grounds of disqualification from jury service, but rather a directive to the Legislature that "laws shall be made" disqualifying at least the classes of ex-felons listed therein. Nothing in this provision or any other part of the Constitution limits the power of the Legislature to add further classes of ex-felons to those mentioned, or indeed to exclude all such persons from jury service if it is deemed appropriate to do so in aid of a legitimate state goal.

Finally, we reach defendant's contention that he was denied equal protection because of the exclusion of resident aliens from jury service. The argument is untenable for either of two reasons.

First, defendant appears to lack standing to raise the point. He does not allege that he is a resident alien, and the parties stipulated merely that he is "of Mexican descent." If we construe this stipulation to mean that defendant is not in fact a member of the class of resident aliens, his claim is barred by the general rule that "a charge of unconstitutional discrimination can only be raised in a case where this issue is involved in the determination of the action, and then only by the person or a member of the class of persons discriminated against." (*People* v. *Globe Grain & Mill. Co.* (1930) 211 Cal. 121, 127-128 [294 P. 3]; accord, *Estate of Horman* (1971) 5 Cal.3d 62, 77-78 [95 Cal.Rptr. 433, 485 P.2d 785]; *Lumber Co.* v. *Bank of America etc. Assn.* (1936) 7 Cal.2d 14, 22 [59 P.2d 1019]; *A. F. Estabrook Co.* v. *Industrial Acc. Com.* (1918) 177 Cal. 767 [177 P. 848]; *Francis* v. *County of Stanislaus* (1967) 249 Cal.App.2d 862, 868-869 [57 Cal.Rptr. 881], and cases cited.) Indeed, "This is a matter on which the courts in all jurisdictions are in full agreement." (16 Am.Jur.2d, Constitutional Law, § 123, p. 320, fn. 6, collecting cases.) We have admitted a limited exception to this rule in cases in which no member of the class would ever be in a position to complain of the discrimination (*Quong Ham Wah Co.* v. *Industrial Acc. Com.* (1920) 184 Cal. 26, 32 [192 P. 1021, 12 A.L.R. 1190]; see also *Barrows* v. *Jackson* (1953) 346 U.S. 249, 257-258 [97 L.Ed. 1586, 1595-1597, 73 S.Ct. 1031]), but that situation is obviously not presented here.[14]

---

[14]Cases such as *Taylor* v. *Louisiana* (1975) *supra,* 419 U.S. 522, 526 [42 L.Ed.2d 690, 695-696], and *Peters* v. *Kiff* (1972) *supra,* 407 U.S. 493, 496-505 [33 L.Ed.2d 83, 89-95], are not in point on this issue. They hold only that for the purpose of claiming a violation of

In the alternative, if we construe the stipulation to mean that defendant is a Mexican national lawfully residing in our country, the short answer to his claim is that jury service has now been recognized as one of the basic decision-making functions of government that substantially affect the members of the political community and hence may constitutionally be restricted to citizens. In *Foley* v. *Connelie* (1978) 435 U.S. 291 [55 L.Ed.2d 287, 98 S.Ct. 1067], the United States Supreme Court held that a New York statute excluding aliens from service on the state police force did not violate the equal protection clause of the Fourteenth Amendment. In explaining its holding the court reasoned, inter alia, as follows: "A new citizen has become a member of a Nation, part of a people distinct from others. [Citation.] The individual, at that point, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking. Accordingly, we have recognized 'a State's historical power to exclude aliens from participation in its democratic political institutions,' [*Sugarman* v. *Dougall,* 413 U.S. at p. 648 (37 L.Ed.2d at p. 863, 93 S.Ct. at p. 2850)], as part of the sovereign's obligation ' "to preserve the basic conception of a political community." ' 413 U.S. at p. 647 [37 L.Ed.2d at p. 863, 93 S.Ct. at p. 2850].

". . . This is not intended to denigrate the valuable contribution of aliens who benefit from our traditional hospitality. It is no more than recognition of the fact that a democratic society is ruled by its people. Thus, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions. See 413 U.S., at pp. 647-649 [37 L.Ed.2d at pp. 862-864, 93 S.Ct. at pp. 2850-2851]. *Similar considerations support a legislative determination to exclude aliens from jury service.* See *Perkins* v. *Smith,* 370 F.Supp. 134 (Md. 1974), aff'd, 426 U.S. 913 (1976) [49 L.Ed.2d 368, 96 S.Ct. 2616]." (Italics added.) (435 U.S. 291, 295-296 [55 L.Ed.2d 287, 292, 98 S.Ct. 1067, 1070-1071].)

We are not persuaded that a different result should be reached under the equal protection clause of the California Constitution (art. I, § 7, subd. (a)). Our courts have applied the principle that aliens may lawfully be excluded from participation in the decision-making functions of the government of this state (*Padilla* v. *Allison* (1974) 38 Cal.App.3d 784 [113 Cal.Rptr. 582] [exclusion of resident aliens from voting]; *People* v.

the right to a jury drawn from a representative cross-section of the community, the defendant need not be a member of the cognizable group excluded from jury service. California law is in accord, and it is for this reason that in Part I of this opinion we do not discuss the question of defendant's citizenship when we review his claim that the exclusion of aliens violates the representative cross-section requirement.

*Rodriguez* (1973) 35 Cal.App.3d 900 [111 Cal.Rptr. 238] [same]), and no reason appears at this time to view jury service as any less a part of that process than does the United States Supreme Court.

We conclude that the statutes barring ex-felons and resident aliens from jury service in California are not vulnerable to the constitutional attack here pressed, and hence that respondent superior court may properly proceed to try defendant on the charge pending against him.

The alternative writ is discharged and the peremptory writ is denied.

Manuel, J., concurred.

Clark, J., and Richardson, J., concurred in the result.

**TOBRINER, J.**—I dissent.

In concluding that the statutory exclusion of all ex-felons and all resident aliens from jury service is not inconsistent with the state or federal constitutional right to trial by a jury drawn from a "representative cross-section of the community," the majority imposes a new "require-ment" or "condition" on the right to a representative jury never before articulated, or countenanced, in any United States or California Supreme Court decision. In contrast to prior cases, which have established that the values secured by the representative jury requirement suffer diminution whenever an identifiable group sharing a common perspective arising from their life experience is excluded from jury service, the majority holds that the exclusion of such a group does no violence to the Constitution unless it is shown "that no other members of the community are capable of adequately representing the perspectives of the group assertedly excluded." (*Ante,* p. 98.)

As I shall explain, this additional requirement—fashioned by the majority out of whole cloth—would entirely undercut the constitutional right and invalidate virtually all prior decisions of the United States and California Supreme Courts striking down the exclusion of broad classes of individuals from jury service.[1] For example, if the state arbitrarily

---

[1]Although a number of lower federal courts appear to have imposed this additional requirement (see *United States* v. *Guzman* (S.D.N.Y. 1972) 337 F. Supp. 140, affd. 468 F.2d 1245 (2d Cir. 1972) cert den. (1973) 410 U.S. 937 [35 L.Ed.2d 602, 93 S.Ct. 1397]; *United States* v. *Potter* (9th Cir. 1977) 552 F.2d 901), these cases cite no direct authority of the Supreme Court for the proposition and in any event are not controlling in this court, even on the federal constitutional question.

enacted a statute providing for the exclusion of blacks whose last names begin with A through L, under the majority's theory the statute would not be invalid since blacks with last names beginning with M through Z could adequately represent the viewpoints of the group of excluded blacks. The majority's "vicarious" representation analysis would place on the defendant the impossible burden of demonstrating that the experiences of the first group differs from the second group; absent such a showing, the state would not even be put to the burden of justifying such an irrational exclusion.

As I shall demonstrate, prior decisions of both this court and the United States Supreme Court have condemned the exclusion from jury service of Chicanos, women, and wage earners, for example, but have never suggested that such exclusion of a broad class of individuals would be permissible as long as there remained in the jury pool some members of the community "capable of representing the perspectives" of the excluded group. In the long line of cases involving the exclusion of blacks, the courts have consistently held such practice unconstitutional and have uniformly limited the inquiry to whether that exclusion was demonstrated to be intentional or systematic.[2]

In *Hernandez* v. *Texas* (1954) 347 U.S. 475 [98 L.Ed. 866, 74 S.Ct. 667], the high court concluded that in view of the pervasive discriminatory attitudes of the local community against Chicanos, those of Mexican descent constituted a separate class distinct from whites. The 'court held unconstitutional the systematic exclusion from jury service of that identifiable class. Although the exclusion of Chicanos might have left in the jury pool other minorities of the community who had been subjected to similar discriminatory treatment, the court never suggested that such exclusion could have thereby become permissible.

In *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412], the Supreme Court invalidated jury selection procedures that tended to exclude wage earners. The fact the exclusion was not complete, leaving some wage earners on the jury panel who theoretically could have represented the viewpoints of that class general-

---

[2]*Carter* v. *Texas* (1900) 177 U.S. 442 [44 L.Ed. 839, 20 S.Ct. 687]; *Norris* v. *Alabama* (1935) 294 U.S. 587 [79 L.Ed. 1074, 55 S.Ct. 579]; *People* v. *Hines* (1939) 12 Cal.2d 535 [86 P.2d 92]; *Smith* v. *Texas* (1940) 311 U.S. 128 [85 L.Ed. 84, 61 S.Ct. 164]; *Patton* v. *Mississippi* (1947) 332 U.S. 463 [92 L.Ed. 76, 68 S.Ct. 184, 1 A.L.R.2d 1286]; *Eubanks* v. *Louisiana* (1958) 356 U.S. 584 [2 L.Ed.2d 991, 78 S.Ct. 970]; *Swain* v. *Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824]; *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163]; *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

ly, did not save the exclusionary policy. Although presumably former wage earners remained on the panel since most businessmen and other nonwage earners were, at one time, wage earners and therefore could, under the majority's view, theoretically represent that "perspective," their presence on the jury never even received consideration in the court's analysis.

Most recently, in *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692], the Supreme Court held that the Sixth Amendment right to a jury drawn from a fair cross-section of the community forbade the systematic exclusion of "distinctive" groups such as women from the pool.[3] Nothing beyond the ascertainment of the excluded class' identifiability was necessary to invoke the constitutional protection.

In view of the total void of United States or California Supreme Court[4] decisions for the majority's new "vicarious" representation theory, I am not surprised that the majority cites no authority for its proposition. Indeed I find no intervening developments that justify a deviation from Justice Mosk's former view expressed in his dissent in *Adams* v. *Superior Court* (1974) 12 Cal.3d 55, at page 66 [115 Cal.Rptr. 247, 524 P.2d 375], that once a group is found to exist and is identifiable and ascertainable, "[a]ny further determination of the 'cognizableness' of the class is unnecessary."[5]

Not only is the additional requirement imposed by the majority without authority; an analysis of the prior decisions establishes a number of compelling reasons why such a requirement would be improper.

In the first instance, in *Smith* v. *Texas* (1940) 311 U.S. 128, 130 [85 L.Ed. 84, 86, 61 S.Ct. 164], the U.S. Supreme Court declared over 35 years ago that "[T]he exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it . . .

---

[3]See also *Glasser* v. *United States* (1942) 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457] and *Ballard* v. *United States* (1946) 329 U.S. 187 [91 L.Ed. 181, 67 S.Ct: 261].

[4]The "vicarious" representation theory similarly has never been countenanced by any of our jury exclusion cases. See, e.g., *People* v. *Hines* (1939) 12 Cal.2d 535 [86 P.2d 92]; *People* v. *White* (1954) 43 Cal.2d 740 [278 P.2d 9]; *Adams* v. *Superior Court* (1974) 12 Cal.3d 55 [115 Cal.Rptr. 247, 524 P.2d 375]; *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

[5]The majority opinion in *Adams* did not hold to the contrary; the court merely held that residents of less than one year did not share sufficient common grounds to make them a cohesive or cognizable group—i.e., the class of new residents did not even meet the first stage of the majority's test in the instant case.

but is at war with basic concepts of a democratic society and a representative government."[6] The majority opinion, in sanctioning the exclusion of qualified persons[7] from jury service on the ground that other nonexcluded persons can adequately stand in their stead, validates a mode of constitutional analysis that is similarly "at war with basic concepts of a democratic society and a representative government." The denial of jury participation to groups under the majority's theory is no more proper than the denial of the right to vote to a class of citizens on the ground that their interests and perspectives are adequately served by a similar class who have been afforded that right.[8]

Moreover, since "[c]ommunity participation in the administration of the criminal law . . . is not only consistent with our democratic heritage, but is also critical to public confidence in the fairness of the criminal justice system,"[9] we have been taught that "The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and the democratic ideal reflected in the processes of our courts."[10] As Justice Mosk observed only five years ago, "Discrimination against any group makes participation less universal and detracts from the jury as a democratizing institution." (*Adams, supra,* at p. 67.)[11] The majority's "vicarious" representation theory clearly conflicts with the fundamental democratic values underlying the cross-section requirement.

---

[6]See also *Glasser* v. *United States, supra,* 315 U.S. at pages 85-86 [86 L.Ed. at pages 707-708].

[7]Ex-felons and aliens are excluded even if they meet the general qualifications set forth in Code of Civil Procedure section 198 et seq. requiring for jury eligibility, a minimum residency period, mental competence, fair character and approved integrity, and the ability to understand and speak English.

[8]See *Adams, supra,* 12 Cal.3d at page 67 (dis. opn. of Mosk, J.)

[9]*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692].

[10]*Ballard* v. *United States* (1946) 329 U.S. 187, 195 [91 L.Ed. 181, 186-187, 67 S.Ct. 261]. Hence, reversible error stemming from an improperly constituted jury is not dependent upon a showing of actual prejudice in an individual case. (*Id.,* at p. 195 [91 L.Ed. at p. 186]; *Walter* v. *State* (1935) 208 Ind. 231 [195 N.E. 268, 98 A.L.R. 607].) In fact, in *Thiel,* the Supreme Court found it immaterial that the jury which actually tried the particular case contained a substantial number of wage earners. (328 U.S. at p. 225 [90 L.Ed. at p. 1187].)

[11]Ironically, the political and social value of governmental participation through jury service may be especially significant to groups historically disenfranchised and victimized by public and private discrimination, as are the two groups at controversy here. Particularly with respect to ex-felons, the stigma attached to their exclusion is likely to be " 'a hindrance to the efforts of society to rehabilitate former felons and convert them into law-abiding and productive citizens.' " (*Richardson* v. *Ramirez* (1974) 418 U.S. 24, 79 [41

Secondly, the requirement that the jury reflect a *"fair* cross-section of the community," by definition, renders significant the relative *proportions* of all cognizable groups comprising the jury pool. (*Taylor* v. *Louisiana, supra,* 419 U.S. 522; *Thiel* v. *Southern Pacific Co., supra,* 328 U.S. 217.) In *People* v. *White, supra,* 43 Cal.2d 740, 750, for example, this court invalidated a jury selection procedure under which the jury list was "improperly *weighted* so as to prevent having a good cross-section of the community for prospective jurors." (Italics added.) Thus, even assuming that the excluded group shares identical viewpoints with another included group, the relative *proportion* of persons holding that viewpoint will be significantly reduced by the intentional and systematic exclusion. Although a cognizable viewpoint is not totally excluded, no *"good cross-section* of the community" would obtain.[12]

Finally, and perhaps most significantly, prior decisions suggest the impossibility of determining whether other groups can "adequately" represent the excluded group's "perspectives." In *Peters* v. *Kiff* (1972) 407 U.S. 493, at pages 503-504 [33 L.Ed.2d 83, at page 94, 92 S.Ct. 2163], Justice Marshall observed: "[T]he exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases . . . . When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that their exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." Similarly, the court stated in *Ballard* v. *United States* (1946) 329 U.S. 187, at pages 193-194 [91 L.Ed. 181, at page 186, 67 S.Ct. 261]: "[I]t is not enough to say that women when sitting as jurors neither act nor tend to act as a class. . . . [T]he subtle interplay of influence one on the other is among the imponderables. To insulate the courtroom from either [sex] may not in a given case make an iota of difference. Yet a flavor, a distinct quality is lost if either sex is excluded."

L.Ed.2d 551, 585, 94 S.Ct. 2655] (dis. opn. of Marshall, J.) (quoting a memorandum of the Secretary of State of California in opposition to certiorari).)

[12] The majority's own figures demonstrate that resident aliens rival naturalized citizens in numbers. (See majority opn., *ante,* p. 100, fn. 8.) Although there may be more ex-misdemeanants who have experienced incarceration than ex-felons in the population, the size of the latter class is still substantial in relation to the former. In 1973, it was estimated that there were approximately 100,000 ex-felons in the state. (*Ramirez* v. *Brown* (1973) 9 Cal.3d 199, 203, fn. 2 [107 Cal.Rptr. 137, 507 P.2d 1345].)

The subtleties and complexities of human experiences, beyond the court's capabilities of evaluation, constitute the underpinning of the cross-section requirement. We are simply not in a position to make fine judgments as to the fungibility of identifiable segments of the community.

Indeed, the fallacy of the court's assumption that it can determine which groups can adequately represent others find vivid demonstration in the majority's application of its newly fashioned requirement to the two groups at controversy.

Regarding the exclusion of resident aliens, the majority asserts that naturalized citizens, most of whom presumably were previously resident aliens themselves and therefore shared both the disabilities and resulting outlook of today's resident aliens, adequately represent their viewpoints on the jury. The passage of time and the intervening attainment of citizenship, however, may well have changed whatever "outlook" naturalized citizens may have previously held. Since we weigh important constitutional rights, we surely must eschew crucial assumptions based on unsupported speculations.[13]

Even apart from the tenuous factual assumptions upon which the majority's holding rests, the theory of vicarious representation through former experiences threatens to undercut the efficacy of the cross-section requirement. Members of a "cognizable group" do not have to share an immutable status or trait. In *Thiel* v. *Southern Pacific Co., supra,* the Supreme Court held that "economic, social, religious, racial, political and geographic groups of the community" could not be systematically excluded from jury service consistent with the Constitution. (328 U.S. at p. 220 [90 L.Ed. at p. 1185].) (We reaffirmed that principle only recently

---

[13]Justice Mosk, in his dissenting opinion in *Adams* v. *Superior Court, supra,* pointedly rejected the practice of relying on such unsupported assumptions. He noted: "No authority is cited, and I have found none, either to support or refute petitioner's *ipse dixit* declaration that newcomers have the same cross-section of views and backgrounds as more settled residents. It is more probable, however, that those who have residence of less than one year may not yet have irrevocably strong ties to the community; their involvement in local employment, business, homeownership, club or church activities, or school or neighborhood associations is far less than that of long-term residents. Whatever osmotic influence these community roots may have ultimately on one's outlook and perspective, newer residents *are* potentially different. To exclude them is to limit the structure of the panel as a genuine cross-section of the community; if there is a difference, that difference is excluded." (Italics in original.) (12 Cal.3d at p. 66.) The majority notably admits "there may be a difference in degree but not of kind," between resident aliens and naturalized citizens. But matters "of degree," of the relative intensity of one's experiences, attitudes, and opinions, may have a substantial effect upon one's responses as a juror. Therefore, the concession admits the flaw fatal to the majority's conclusion.

in *Wheeler, supra,* at p. 10.) Of those characteristics, only race constitutes an immutable status. Yet the majority's characterization of resident aliens can apply to any of the other groups listed in *Thiel.*

Furthermore, the discussion as to ex-felons reveals a fundamental inconsistency between the majority's jury cross-section and equal protection analyses. The majority asserts that the particular viewpoint of ex-felons is adequately represented on the jury by individuals who have similarly experienced the "loss of personal liberty followed by social stigmatization," such as misdemeanants who have served time in county jail, persons who have been confined in the custody of the Youth Authority, or spent periods of involuntary commitment in state mental institutions. Aside from the absence of evidence within or without the record to substantiate this "fact,"[14] this assumption conflicts with the majority's subsequent conclusion that the exclusion passes equal protection muster under the rational basis test because the Legislature could have reasonably determined that ex-felons *in particular* "might well harbor a continuing resentment against 'the system' that punished him and an equally unthinking bias in favor of the defendant on trial, who is seen as a fellow underdog caught in its toils." (*Ante,* p. 101.)

If ex-felons cannot be distinguished from other persons formerly incarcerated for Sixth Amendment purposes, how can the two groups rationally be treated differently under the equal protection clause of the Fourteenth Amendment? Conversely, if it is reasonable to assume that ex-felons, "who ha[ve] suffered the most severe form of condemnation that can be inflicted by the state—a conviction of felony and punishment therefor" (*ante,* p. 101), are more "resentful" than other persons experiencing confinement, then that assumption would similarly establish that they are not adequately represented by such other persons on the jury. The factual predicates to the two conclusions the majority reaches are mutually exclusive and logically irreconcilable.

In rejecting the analysis adopted by the majority, I conclude that the challenged statutes exclude a "cognizable group" from jury service. Once a "cognizable group" has been excluded—and the majority concedes that but for the "vicarious" representation requirement, both resident aliens and ex-felons constitute "cognizable groups"—the state must come forth with substantial justification to demonstrate that the exclusion is neces-

---

[14]Another example of the majority's untempered willingness to speculate is found in its declaration that "surely an ex-felon's experienced incarceration is more likely to affect his deliberations as a juror than his vote as an elector." (*Ante,* p. 102, fn. 13.)

sary to serve an important state interest.[15] Recently, in *Taylor* v. *Louisiana, supra,* 419 U.S. at page 534 [42 L.Ed.2d at page 700], the United States Supreme Court explained that a "defendant's Sixth Amendment right to a jury drawn from a fair cross-section of the community . . . *cannot be overcome on merely rational grounds. There must be weightier reasons . . . .*" (Italics added.) Moreover, as Justice Mosk previously expressed in his dissent in *Adams, supra,* 12 Cal.3d at page 68, when a cognizable group has been excluded from jury service, "the state must not only establish a legitimate purpose in creating the classification but must show that the distinction drawn by the statute is necessary to further the asserted interest." (12 Cal.3d at p. 68.) Our task, I believe, is to evaluate the broad exclusionary provisions at issue here against these previously articulated standards. (See also *Duren* v. *Missouri* (1979) 439 U.S. 357, 364-366 [58 L.Ed.2d 579, 587-588, 99 S.Ct. 664].)

The apparent objective of the Legislature in excluding ex-felons from jury eligibility is to protect the right to trial by an impartial jury. I have no doubt that this is a legitimate and compelling state interest. (*Wheeler, supra,* 22 Cal.3d at p. 266.) The exclusion, however, is not necessary to achieve that objective. Indeed, the scheme is not even rationally related to that purpose.

The majority posits that an ex-felon "might well harbor a continuing resentment against 'the system' that punished him and an equally unthinking bias in favor of the defendant on trial, who is seen as a fellow underdog caught in its toils." (*Ante,* p. 101.) Starting with the fundamental tenet that "jury competence is an individual rather than a group or class matter" (*Thiel, supra,* 328 U.S. at p. 220 [90 L.Ed. at p. 1185]), the reliance upon presumptions about group or class biases in the exclusion of a cognizable group from the jury flies squarely in the face of the rationale of the cross-section rule.

As we noted in *Wheeler, supra,* 22 Cal.3d at pages 276-277, footnote 17: " 'It may be argued that the exclusion of jurors on the basis of group membership would be acceptable where it is believed that, for example, blacks are consistently more biased in favor of acquittal than whites. The argument misses the point of the right to an impartial jury under *Taylor.*

[15]Commentators have argued for the applicability of strict judicial scrutiny when the cross-section requirement has been violated. (See Van Dyke, Jury Selection Procedures (1977) ch. 3, pp. 72-76; Kairys et al., *Jury Representativeness: A Mandate for Multiple Source Lists* (1977) 65 Cal.L.Rev. 776, 782-788; Daughtrey, *Cross-Sectionalism in Jury-Selection Procedures After Taylor v. Louisiana* (1975) 43 Tenn.L.Rev. 1, 47, fn. 212.)

Blacks may, in fact, be more inclined to acquit than whites. The tendency might stem from many factors, including sympathy for the economic or social circumstances of the defendant, a feeling that criminal sanctions are frequently too harshly applied, or simply an understandable suspicion of the operations of government. Whites may also be more inclined to convict, particularly of crimes against a white victim. But these tendencies do not stem from individual biases related to the peculiar facts or the particular party at trial, but from differing attitudes toward the administration of justice and the nature of criminal offenses. *The representation on juries of these differences in juror attitudes is precisely what the representative cross-section standard elaborated in Taylor is designed to foster.'* (Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries* (1977) 86 Yale L.J. 1715, 1733, fn. 77.)" (Italics added.)

Even were we to ignore our own observation in *Wheeler* that "the presumed group bias that triggered the peremptory challenges [or statutory exclusion as in the instant case] against its members is indistinguishable from the group perspective we seek to encourage by the cross-section rule" (22 Cal.3d at p. 276), the imprecise fit between the statute and its objective cannot constitutionally be tolerated. In the parallel context of *Otsuka* v. *Hite* (1966) 64 Cal.2d 596 [51 Cal.Rptr. 284, 414 P.2d 412], we held that a construction of the term "infamous crime" in article II, section 1 of the California Constitution permitting the blanket disenfranchisement of all felons would be unconstitutionally broad *under the rational basis test* of *McLaughlin* v. *Florida* (1964) 379 U.S. 184 [13 L.Ed.2d 222, 85 S.Ct. 283]. (*Otsuka, supra,* 64 Cal.2d at p. 605.) Thus, in order to save the validity of that state constitutional provision, we construed it to apply only to those crimes, the elements of which "are such that he who has committed it may reasonably be deemed to constitute a threat to the integrity of the elective process." (64 Cal.2d at p. 611.)[16]

The fatally overbroad character of the exclusion in *Otsuka* applies with equal force here. The instant exclusion applies to every former felon, regardless of his crime, the remoteness in time of the offense, the fact that the ex-felon may have since been leading an exemplary life and not evinced any "resentment" towards "the system," and the relative severity

---

[16]Although we later tightened the requisite "fit" between the ends and means of such an exclusion so as to require a less onerous alternative analysis (see *ante,* p. 109, fn. 12), the result of our testing the challenged provision in *Otsuka* against the rational basis test remains intact.

and length of time that has passed since the punishment sanctioned. Indeed, although the instant statutes presume that the ex-felon will be "resentful" as a result of incarceration experience, the fact that he may have received probation and never actually have been incarcerated is presently irrelevant to his jury eligibility.[17]

The statute is also underinclusive. As I have pointed out, the majority's contention that other persons experiencing incarceration are capable of representing the viewpoints of ex-felons as a result of similar life experiences logically renders the exclusion of *only* ex-felons from jury service irrational. Moreover, just as prodefendant bias is presumed of ex-felons by the exclusionary scheme, the converse corollary presumption of proprosecution bias on the part of victims of crimes would dictate their automatic exclusion as well. I fail to see how the state can reasonably differentiate between these groups in its effort to assure jury impartiality.

In view of the irrational fit between the avowed objective and classification of the statute and the countervailing policy and constitutional considerations, the exclusion is clearly irrational. A fortiori, the exclusion of ex-felons from jury service cannot pass constitutional muster under the more demanding scrutiny required by *Taylor* v. *Louisiana, supra,* 419 U.S. at page 534 [42 L.Ed.2d at page 700].

Similarly, I believe that the exclusion of resident aliens fails to pass constitutional muster under a realistic application of the appropriate governing standard. In defending the statutory exclusion of resident aliens from jury service, the majority assert that such exclusion is consistent with the " ' "State's historical power to exclude aliens from participation in its democratic political institutions as part of the sovereign's obligation to preserve the basic conception of a political community." ' " (*Ante,* p. 104.) In recent years, the United States Supreme Court has stated that this state interest in the preservation of a "political

---

[17]Although conceding that the scheme is "arguably imprecise," the majority asserts that "in some ways" the instant exclusion is more precise than the restriction on suffrage in *Otsuka* since an ex-felon's experience of incarceration is more likely to affect his deliberations as a juror than his vote as an elector. (*Ante,* p. 102, fn. 13.) But the posited juxtaposition is specious since the real question is whether the probative value of one's incarceration experience in determining his ability to engage in unbiased deliberations as a juror is greater than the probative value of one's proven criminality to his honest and uncorrupt exercise of his franchise. I submit that the fact that the statute takes no account of a former felon's actual incarceration experience renders the exclusion as imprecise as the restriction in *Otsuka.*

community" permits a state to deny aliens the right to vote, to run for public office (see *Sugarman* v. *Dougall* (1973) 413 U.S. 634, 647-649 [37 L.Ed.2d 853, 862-864, 93 S.Ct. 2842]), or to hold important nonelective public positions, explaining that "officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government." (*Id.,* at p. 647 [37 L.Ed.2d at p. 863].) For a number of reasons, however, I do not believe that jury service rationally falls within the ambit of voting or political decisionmaking, from which resident aliens may legitimately be excluded.

First, the role and function of the jury is substantially different from that of the voter. In relation to the state's sovereign interest, "voting produces a permanent effect upon the entire community, its governance, its fisc, its future; jury service involves the property or liberty of a single individual on an ad hoc basis." (*Adams, supra,* 12 Cal.3d at p. 69 (dis. opn. of Mosk, J.).) And while the exercise of the political franchise of voting is of fundamental importance since it preserves all other basic civil and political rights and constitutes the very underpinning of a free and democratic society,[18] the same cannot be said for jury service.[19]

Additionally, in contrast to the act of voting, which is an unrestrained personal expression of favor or disfavor for particular policies, personalities or laws, the jurors' powers are closely circumscribed by the judge who determines the admissibility of evidence, who can suppress unreasonable appeals to prejudice, and who instructs the jury as to the applicable law.[20] The special verdict and the directed verdict further limit the jury's role.

Furthermore, although the general societal importance of juries cannot be gainsaid (see *Duncan* v. *Louisiana* (1968) 391 U.S. 145, 155 [20 L.Ed.2d 491, 499, 88 S.Ct. 1444]; *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 519, fn. 15 [20 L.Ed.2d 776, 783, 88 S.Ct. 1770]), their role is not equivalent to the public officials and important nonelected officials described in

---

[18] *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 370 [30 L.Ed. 220, 226, 6 S.Ct. 1064]; *Reynolds* v. *Sims* (1964) 377 U.S. 533, 561-562 [12 L.Ed.2d 506, 526-528, 84 S.Ct. 1362]; *Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663, 667 [16 L.Ed.2d 169, 173, 86 S.Ct. 1079].

[19] The fact that jury service does not play as central a role as the exercise of political franchise does not mean that such participation in the judicial forum is not an important right. The observation is only a *comparative* one, and it is not inconsistent with the position that participation by all cognizable groups on juries is in accordance with, if not compelled by, adherence to democratic principles and ideals.

[20] See *United States* v. *Guzman* (S.D.N.Y. 1972) 337 F.Supp. 140, 144.

*Sugarman.* Since the function of the jury is to apply given law to a specific set of facts on only an individual ad hoc basis, the role of jurors is not "so close to the core of the political process as to make [them] formulator[s] of government policy." (*In re Griffiths* (1973) 413 U.S. 717, 729 [37 L.Ed.2d 910, 919, 93 S.Ct. 2851].)[21]

Our decision in *Raffaelli* v. *Committee of Bar Examiners* (1972) 7 Cal.3d 288 [101 Cal.Rptr. 896, 496 P.2d 1264, 53 A.L.R.3d 1149] and the United States Supreme Court's decision in *In re Griffiths, supra,* 413 U.S. 717, are instructive on this point. In *Raffaelli,* we held that although attorneys hold positions of "high responsibility and trust," and have a "privileged and intimate relationship with the courts of California" (7 Cal.3d at p. 301), the state could not, consistent with the Constitution, exclude aliens from practicing law. Similarly, in *In re Griffiths,* the high court recognized that Connecticut lawyers had broad authority given by the state to " 'sign writs and . . . take depositions and acknowledgment of deeds.' . . . [and] command the assistance of a county sheriff or a town constable" and even were statutorily designated as " 'commissioner[s] of the Superior Court.' " (413 U.S. at p. 723 [37 L.Ed.2d at p. 916].) Yet the court found that this was insufficient to "place one so close to the core of the political process as to make him a formulator of government policy." (*Id.,* at p. 729 [37 L.Ed.2d at p. 919].) The court thus held, in accordance with our decision in *Raffaelli,* that the exclusion of aliens from the legal profession could not be constitutionally sustained. In view of the central and continuing role attorneys play as officers of the court (see *In re Griffiths, supra,* at pp. 730-734 [37 L.Ed.2d at pp. 920-922] (dis. opn. of Burger, C. J.)), I fail to see how jurors with narrow responsibilities acting on an ad hoc basis can be deemed to be part of the "political community" while attorneys are not.

---

[21]It does not follow, however, that jury service from the viewpoint of excluded individuals is not a "fundamental interest" for purposes of equal protection analysis. A distinction must be drawn between the state's sovereign interest and the interests of individuals seeking the opportunity to serve on juries. The fact that the jury is not involved in the formulation of broad governmental policy and that therefore jurors cannot be deemed part of the "political community" demonstrates only the limit of the state's interest in protecting its sovereignty. In relation to the individual, participation in the judicial process constitutes a valuable singular opportunity to directly participate in one aspect of our democratic government. Since the importance of jury service to the state is not necessarily equivalent to its value to the individual, it is not inconsistent to find no legitimate state purpose here while maintaining that the right to serve on juries is a "fundamental right" under equal protection analysis. I continue to dissent from this court's holding in *Adams* that there is no such fundamental interest of individuals to serve on juries.

Accordingly, I would hold the exclusion of resident aliens from jury service invalid under article I section 16 of the California Constitution.[22]

In sum, in my view the statutory provisions excluding resident aliens and ex-felons from jury service violate a defendant's right to an impartial jury drawn from a representative cross-section of the community, and therefore cannot be sustained.

Over 30 years ago, the United States Supreme Court observed: "Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual, rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury." (*Thiel* v. *Southern Pacific Co., supra,* 328 U.S. 217, 220 [90 L.Ed. 1181, 1185].) We would do well to heed that wisdom.

Bird, C. J., and Newman, J., concurred.

**NEWMAN, J.**—I concur with Justice Tobriner's dissent, except that I would cite only the California and not the federal Constitution. In addition:

I

Article I, section 8 of the California Constitution states, "A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin." In this case individuals were excluded from jury service because of national origin.

Is jury service "a vocation, or employment"? I think so. It would not be strange to say that a friend or colleague "has been busily employed as

---

[22]Although a number of federal cases have indicated that the exclusion of aliens from jury service does not violate the federal Constitution (see *Foley* v. *Connelie* (1978) 435 U.S. 291 [55 L.Ed.2d 287, 98 S.Ct. 1067]; *Perkins* v. *Smith* (D.Md. 1974) 370 F.Supp. 134, affd., 426 U.S. 913 [49 L.Ed.2d 368, 96 S.Ct. 2616]), those decisions are, of course, not controlling as to a defendant's right to an impartial jury under article I, section 16 of our state Constitution. We explicitly held in *Wheeler* that the representative cross-section requirement guaranteed by our state Constitution is independent of the similar federal guarantee under the Sixth Amendment. (22 Cal.3d at p. 272.) Because I believe that the federal cases noted above are inconsistent with prior California decisions involving discrimination against aliens, such as *Raffaelli,* I would hold the instant exclusion invalid under the state constitutional guarantee.

juror for the past two weeks." Indeed many kinds of activities properly are regarded as employment. Article I, section 8 covers seasonal employment, part-time employment, volunteer employment, employment at a polling booth, moonlighting, and innumerable other tasks. In 1974, when they revised section 8, the electors pronounced that persons should not be disqualified from entering or pursuing those tasks because of sex, race, creed, color, or national or ethnic origin. I see no reason for adopting a restrictive view as to what was meant by "employment."

Furthermore, does not section 8 imply that "entering or pursuing . . . employment" is a fundamental right? On their face the words seem to complement the words in article I, section 1 that proclaim inalienable rights of "enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." All those rights are fundamental, I believe.

## II

Issues regarding the use by courts of "sociological facts" are often perplexing. In this case I question three conclusions of fact that to me seem insufficiently supported. The first is in footnote 13 of the majority opinion, which declares that "surely an ex-felon's experience of incarceration is more likely to affect his deliberations as a juror than his vote as an elector." I find no evidence anywhere to support that conclusion.

Second, I do not agree that convicted misdemeanants who have served time in jail or youthful offenders who have been confined in CYA custody or people who have suffered involuntary commitment in mental institutions are individuals whose "experiences of loss of personal liberty followed by social stigmatization" enables them adequately to represent the arguably unique viewpoints of ex-felons. (*Ante,* p. 99.)

Third, I doubt that naturalized citizens, because (1) once "they shared both the disabilities and the resulting outlook of today's resident aliens," and (2) "still carry with them the deep imprint of their former status," will emphatically respond to the current travails of unnaturalized defendants. (*Ante,* p. 100.) Is that not a little like saying that adults empathize representatively with children because they too were kids once?

The approach that should govern here is that articulated in the dissenting opinion in *Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 66

[115 Cal.Rptr. 247, 524 P.2d 375], as follows: "No authority is cited, and I have found none, either to support or refute petitioner's *ipse dixit* declaration that newcomers have the same cross-section of views and backgrounds as more settled residents. It is more probable, however, that those who have residence of less than one year may not yet have irrevocably strong ties to the community; their involvement in local employment, business, homeownership, club or church activities, or school or neighborhood associations is far less than that of long-term residents. Whatever osmotic influence these community roots may have ultimately on one's outlook and perspective, newer residents *are* potentially different. To exclude them is to limit the structure of the panel as a genuine cross-section of the community; if there is a difference, that difference is excluded." (Italics in original.)

If that view had been adapted to this case the following comment in the letter brief of amicus California Rural Legal Assistance, filed here on October 16, 1978, might have influenced us decisively: "[T]he resident alien population in California is a substantial portion of the state's overall population and is principally composed of racial and ethnic minorities. . . . Thus, in California more than in most other states, the resident alien exclusion removes a sizeable and cognizable class from the workings of our criminal justice system, a class which in California has historically been subject to discrimination against them *both because of their alienage and their race.*" (Italics added.)

### III

My final comment is more technical. Article VII, section 8, subdivision (b) of the California Constitution provides, "Laws shall be made to exclude persons convicted of bribery, perjury, forgery, malfeasance in office, or other high crimes from office or serving on juries." Those words need to be contrasted with the words of Code of Civil Procedure section 199, subdivision (b), which disqualify a person from trial juries if she or he "has been convicted of malfeasance in office or any felony or other high crime." The Legislature apparently regarded all felonies as high crimes. Yet, as the majority opinion here notes, *Otsuka v. Hite* (1966) 64 Cal.2d 596 [51 Cal.Rptr. 284, 414 P.2d 412] declared that "the term 'high crimes' should be deemed to refer to criminal conduct evidencing the kind of moral corruption and dishonesty inherent in the listed offenses of 'bribery, perjury, forgery, malfeasance in office.' " (*Id.* at p. 608.)

Whether or not they are "fundamental," the rights to serve in public office and on juries are clearly treated as important rights in the California Constitution. I do not agree that nothing in article VII, section 8, subdivision (b) restricts the power of the Legislature to add classes of ex-felons to those specified in the section.

Why does the majority opinion err in stating that "[n]othing . . . limits the power of the Legislature to add further classes of ex-felons to those mentioned, or indeed to exclude all such persons from jury service if it is deemed appropriate . . ."? (*Ante,* p. 103.) The answer may appear when we think about "[public] office," for the majority reasoning regarding section 8, subdivision (b) applies to exclusion from office as much as it applies to exclusion from juries. Yet could we possibly conclude that nothing in section 8, subdivision (b) limits the legislative power to add classes of ex-felons via statutes prescribing qualifications for public office? That question indeed could arise in future cases, but this court's analysis in *Otsuka* implied that the Legislature is restricted to "criminal conduct evidencing the kind of moral corruption and dishonesty inherent in the listed offenses . . . ." (*Id.,* p. 608.)

Could the Legislature, for instance, disqualify all ex-felons from membership in the Legislature? Article IV, section 2, subdivision (c), qualifies everyone who "is an elector and has been a resident of the legislative district for one year, and a citizen of the United States and a resident of California for 3 years, immediately preceding the election." *Otsuka* held that felons may be electors. The "high crime" test of article VII, section 8, subdivision (b) may well be the sole exception. (Cf. *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 234 [82 Cal.Rptr. 175, 461 P.2d 375]; *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67 [64 Cal.Rptr. 785, 435 P.2d 553].)

Petitioner's application for a rehearing was denied May 23, 1979. Bird, C. J., and Tobriner, J., were of the opinion that the application should be granted.