116 Cal.Rptr.2d 379 (2002)
95 Cal.App.4th 1346
The PEOPLE, Plaintiff and Respondent,
v.
Manuel HERNANDEZ, Defendant and Appellant.
No. B145238.
Court of Appeal, Second District, Division Four.
February 6, 2002.
Review Granted May 15, 2002.
*382 Nancy J. King, under appointment by the Court of Appeal, Portland, OR, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Linda C. Johnson and Richard T. Breen, Deputy Attorneys General, for Plaintiff and Respondent.
CURRY, J.
Manuel Hernandez appeals from the judgment entered following a jury trial that resulted in his conviction on 22 counts of sexual abuse of a child under 14, lewd acts on a child, oral copulation of a person under age 16, and sexual penetration by a foreign object. He received a sentence of 43 years and 4 months. The only issues we address in this appeal are whether the trial court committed reversible error by removing a juror from the panel near the end of trial and whether double jeopardy bars retrial. The removed juror had spoken out about her perception that disrespect was being shown toward a defense witness. At the same time, the juror stated that she had formed no opinion about the case and promised to remain fair and open-minded. We conclude that on the facts presented, the record does not support the existence of good cause to remove the juror. As a result, appellant was denied his federal and state constitutional right to a trial by a fair and impartial jury, and we see no choice but to reverse his conviction despite the heinousness of the crimes involved.
Moreover, the law is clear that "jeopardy attaches when a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn" and "a discharge of that jury without a verdict is equivalent in law to an acquittal and bars a retrial, unless the defendant consented thereto or legal necessity required it." (Curry v. Superior Court (1970) 2 Cal.3d 707, 712, 87 Cal.Rptr. 361, 470 P.2d 345.) Jeopardy attaches when the jury is empaneled and sworn because of the "need to protect the interest of an accused in retaining a chosen jury." (Crist v. Bretz (1978) 437 U.S. 28, 35, 98 S.Ct. 2156, 57 L.Ed.2d 24.) Although the trial court's motives may have been well-intentioned, the fact remains that by removing a juror who, having heard nearly all the evidence, was sympathetic to the defense, the court tilted the jury toward the prosecution thereby ensuring appellant's conviction. Since the constitutional prohibition against double jeopardy is intended to foreclose judicial attempts to garner advantage for the prosecution or afford it another more *383 favorable opportunity to convict the accused, we are compelled to further hold that the bar of double jeopardy forecloses a new trial.

FACTUAL AND PROCEDURAL
BACKGROUND
The victim who, at trial, was 15 years old, testified that appellant had committed various lewd and lascivious acts and sexual crimes [1] from the time when she was nine or 10 and in the third grade through November 2,1999.
Appellant was interviewed by Hawthorne Police Detective Joel Romero. During the videotaped interview, appellant admitted that for about a year he had engaged in sexual activity with the victim but denied that any of the incidents involved penetration or oral copulation, which he contended was totally taboo in his culture.
At trial, testifying on his own behalf, appellant denied having any sexual relations with the victim, and reiterated his denial of penetration and oral copulation. In his testimony, appellant recalled that during the police interview, he repeatedly denied having sexual relations with the victim and did not make any admissions about her. He also presented a defense of lack of opportunity through two additional witnesseshis former employer and his brother, Wilfredo Hernandez, who had lived with the family during part of the relevant timeframe.

Interview of Juror No. 8
Near the end of the trial, just prior to the cross-examination of appellant, Juror No. 8 informed the court that she "need[ed] help to clarify [her] mind," because "over the last two days a couple of things [had] dropped [her] respect with this system...." She said she was bothered by the tone of the prosecutor's cross-examination of a defense witness and her perception that during the testimony, both the prosecutor and the judge were smirking or making faces. She also expressed concern that much of Detective Romero's testimony was "so much based on truths [sic[2]]," not knowing whether that was "just normal" or whether there was going to be "any direction [from the court] as to how to consider that." She was clear that she "really want[ed] to finish this service" and that it was "important to [her] personally and also for the sake of the case." The reason for requesting the conference was "to clear [her] mind."
The following colloquy ensued:
"THE COURT: I don't know what you mean by `clearing your mind.'
"JUROR NUMBER 8: Well, those two situations that I just explained are making it difficult for me to remain open-minded.
"THE COURT: If you're not feeling open-minded, what are you feeling?
"JUROR NUMBER 8: I just need some I guess response from about whether this is common practice or[¶] . . . [¶]
"[PROSECUTOR]: May I askyou suggested that because I used an aggressive voice in questioning, that you don't think that's appropriate?
"JUROR NUMBER 8: Yeah.... I've been listening to Detective Romero for two days. I feel that the defense witnesses deserve all respect. I felt like there were judgments. Their [sic] facial expressions *384 and your tone. I mean I saw you smirking during [the testimony of] Wilfredo [Hernandez]
"THE COURT: On my face?
"JUROR NUMBER 8: During Wilfredo's testimony.
"THE COURT: You are grossly mistaken. I remain expressionless up there and purposely try to remain as blank-faced as possible. And when Wilfredo was testifying, I observed him; I took notes of his testimony and personally did not disclose any facial expressions. I think it's inappropriate for a judge to exhibit either verbal or physical expressions during the course of a trial. I would parenthetically point out that I don't believe that [appellant's attorney[3]] made any [facial expressions]."
The court allowed the prosecutor to question the juror. The prosecutor asked: "You just don't think you could be fair at this point because of my approach on cross-examination?" The juror denied that she would be unfair: "I still feel I could be fair. I'm committed to being fair. But I was thinking last night and this morning I wanted to write a letter to you after the case was finished and share my observations and how I was disappointed in certain aspects. And I thought, well, wait a minute. Rather than writing a letter, why don't you share what you're thinking?"
The court inquired further about Juror No. 8's perception of Detective Romero's testimony, and clarified that the juror's concern was not that he had lied in his testimony, but that he had been untruthful during appellant's interrogation.[4] The court also asked the juror, "What about the other counsel's manner of questioning caused you concern?" The juror explained: "There is no concern about the manner of questioning, other than the tone that happened yesterday during Wilfredo's testimony. There's no concern about the manner of questioning other than that."
After the prosecutor indicated she had no more questions, appellant's attorney asked: "Have you formed any opinion as to the outcome of this case?" Juror No. 8 said, "No." Appellant's attorney further inquired: "And have you formed an opinionlet me put it this way: could you be open-minded if you were to hear all the rest of the testimony?" Juror No. 8 responded: "Yes."

Trial Court's Findings and Ruling
After this exchange, the court directed Juror No. 8 to return to the deliberation room, and made the comment, "I don't think she can give a fair trial to the People. I don't think she should be kept on the jury." The prosecutor agreed, noting the following personal observations "for the record": "[T]he juror is extremely depressed in body language. Her lower lip *385 was quivering. She's almost frantic." The prosecutor expressed the opinion that the upcoming cross-examination of appellant in which the prosecutor intended to "be more aggressive" would "pull her over the edge for sure." She professed to be concerned for Juror No. 8's "safety" and "psychological health" in seeking the juror's discharge.
The court also expressed concern about Juror No. 8's emotional state. The court portrayed Juror No. 8's demeanor as "very tortured," and noted that she clenched and unclenched her fists and tightly closed her eyes during the interview. The court described the prosecutor's earlier cross-examinations as "on the mild side," "professional," and not subjected to argumentative or badgering objections.[5] The court was not concerned that the juror's view of the court's attitude would have "any effect on her ability to be fair," but thought it might be "a reflection of her psychological state where she was reading some expressions that I had." The court denied having made facial expressions and expressed "surprise[ ] that she would make such a statement" or "draw that inference." The court was also troubled that the juror had described the use of false evidence in questioning appellant as "violence," expressing the opinion that that choice of words was "somewhat irrational." Because of this the court did not believe the juror could "give a fair trial to the People."
Appellant's attorney stated he "would describe [Juror No. 8's] behavior as concerned." He stressed that Juror No. 8 "stated she could be fair," and therefore would "oppose a challenge for cause."
The court did not disagree with counsel's assessment. Nevertheless, the court concluded "the totality of the circumstances," including the juror's "words" and "body language that she made with her hands" led the court to believe that the juror's ability to do her job and "remain an impartial juror without leaning towards one side or the other" had been "substantially impaired." The court then invited a "challenge for cause"[6] on the part of the prosecution, and promptly granted the request.
The court next recalled Juror No. 8 and inquired whether she had expressed her concerns to any other juror or if any other juror had expressed any opinion about the case to her. She responded in the negative. The court told her she was excused. Juror No. 8 responded, "I'm real disappointed. If I thought that was going to be the result, I probably would have chosen to write a letter after the case instead."
After removing Juror No. 8, the court designated an alternate juror to take her place. The court then inquired of each of the 12 jurors and the remaining alternate separately and apart from the other jurors whether he or she had observed anything during trial or if anything had happened since the onset of trial which affected that juror's impartiality. Each juror responded *386 in the negative. The court stated, "It appears the former juror number 8's views were hers and hers alone. And based on the response of the twelve jurors and now one alternate further confirms in my mind that at least [the] gestures she observed on my part were imagined. I'm also mindful of the fact that none of the other jurors expressed any concern or difficulty with the manner of the questioning by either counsel." The court concluded, "It appears to me that this jury remains a fair and impartial jury."

DISCUSSION

I
"A trial court's authority to discharge a juror is granted by Penal Code section 1089, which provides in pertinent part: `If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors.' " (People v. Williams (2001) 25 Cal.4th 441, 447-448, 106 Cal.Rptr.2d 295, 21 P.3d 1209, fn. omitted, italics omitted.)
Appellate courts "`review for abuse of discretion the trial court's determination to discharge a juror and order an alternate to serve. [Citation.] If there is any substantial evidence supporting the trial court's ruling, we will uphold it. [Citation.]" (People v. Marshall (1996) 13 Cal.4th 799, 843, 55 Cal.Rptr.2d 347, 919 P.2d 1280; accord, People v. Williams, supra, 25 Cal.4th at p. 448, 106 Cal. Rptr.2d 295, 21 P.3d 1209; People v. Cleveland (2001) 25 Cal.4th 466, 474, 106 Cal. Rptr.2d 313, 21 P.3d 1225.) However, "[b]efore a juror may be dismissed for losing, during trial, the ability to render a fair and unbiased verdict, `the juror's inability to perform his functions must appear as a "demonstrable reality."'" (People v. Williams (1997) 16 Cal.4th 153, 231, 66 Cal.Rptr.2d 123, 940 P.2d 710, quoting People v. Van Houten (1980) 113 Cal. App.3d 280, 288, 170 Cal.Rptr. 189.) "Bias in a juror may not be presumed." (People v. Williams, supra, 16 Cal.4th at p. 232, 66 Cal.Rptr.2d 123, 940 P.2d 710.)
"The most common application of these statutes permits the removal of a juror who becomes physically or emotionally unable to continue to serve as a juror due to illness or other circumstances." (People v. Cleveland, supra, 25 Cal.4th at p. 474, 106 Cal.Rptr.2d 313, 21 P.3d 1225; see, e.g., People v. Dell (1991) 232 Cal. App.3d 248, 253-254, 256, 283 Cal.Rptr. 361 [excusal of juror whom all parties knew was sick during trial following attack of phlebitis, and excusal of juror taken to hospital following automobile accident].) Similarly, inattentiveness is a proper reason to discharge a juror. (See, e.g., People v. Johnson (1993) 6 Cal.4th 1, 21-22, 23 Cal.Rptr.2d 593, 859 P.2d 673 [juror "exhibiting various physical indicia of sleep"]; People v. Thomas (1994) 26 Cal.App.4th 1328, 1333, 32 Cal.Rptr.2d 177 [juror inattentive to fellow jurors and court].) Also, "[a] sitting juror's actual bias, which would have supported a challenge for cause, renders him `unable to perform his duty' and thus subject to discharge...." (People v. Keenan (1988) 46 Cal.3d 478, 532, 250 Cal. Rptr. 550, 758 P.2d 1081; see, e.g., People v. Green (1956) 47 Cal.2d 209, 215-216, 302 P.2d 307, overruled on another ground in People v. Morse (1964) 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33 [juror stated she did not think she could be fair to *387 People]; People v. Feagin (1995) 34 Cal. App.4th 1427, 1437, 40 Cal.Rptr.2d 918 [juror "prejudged the credibility of the police officers . . . and was unable to cast aside her personal bias in weighing the evidence"].)
On the other hand, ground for discharge does not exist where the juror merely "does not deliberate well" or "relies upon faulty logic or analysis" or "disagrees with the majority ....as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted ...." (People v. Cleveland, supra, 25 Cal.4th at p. 485, 106 Cal.Rptr.2d 313, 21 P.3d 1225.) "[A] court must take care in inquiring into the circumstances that give rise to a request that a juror be discharged, . . . lest the sanctity of jury deliberations too readily be undermined." (Id. at p. 484, 106 Cal.Rptr.2d 313, 21 P.3d 1225.)
The right to trial by an impartial jury guaranteed by the Sixth Amendment of the United States Constitution is an integral aspect of due process in light of the jury's role as "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge." (Duncan v. Louisiana (1968) 391 U.S. 145, 156, 88 S.Ct. 1444, 20 L.Ed.2d 491.) Moreover, such right is "no less implicitly guaranteed by the declaration of article I, section 16, of the California Constitution that `"Trial by jury is an inviolate right and shall be secured to all."'" (Rubio v. Superior Court (1979) 24 Cal.3d 93, 101, 154 Cal. Rptr. 734, 593 P.2d 595.) Because the right to trial by jury is a cornerstone of our system of jurisprudence, it should be zealously guarded by the courts which must resolve any doubt in favor of preserving and furthering such right. (See, e.g., Blanton v. Womancare, Inc. (1985) 38 Cal.3d 396, 411, 212 Cal.Rptr. 151, 696 P.2d 645; Byram v. Superior Court (1977) 74 Cal.App.3d 648, 653, 141 Cal.Rptr. 604.)
Mindful of these principles, we conclude that the trial court abused its discretion in removing Juror No. 8 because evidence of her inability to fulfill her duty to conduct herself as an impartial juror does not appear in the record as a demonstrable reality. (People v. Williams, supra, 25 Cal.4th at p. 448, 106 Cal.Rptr.2d 295, 21 P.3d 1209.)
The record does not reflect that Juror No. 8 was biased in favor of the defense or prejudiced against the People. Although her statements indicated sympathy for a defense witness and dismay over the practice on the part of law enforcement officials of misleading arrestees in order to extract confessions, the juror repeatedly stated she had not made up her mind about the case and would be open-minded and fair. Her concern about Detective Romero's tactics in confronting appellant during the interview with false statements could have been addressed by an appropriate instruction from the court prior to deliberations. Indeed, the juror noted her expectation that the court was "going to advise the jury about that." Similarly, Juror No. 8's concerns regarding her perception of the judge's and the prosecutor's facial expressions could have been resolved by a curative instruction to the jury to disregard such matters during deliberations. (See CALJIC No. 17.32 [jury to disregard anything trial judge said or did with respect to its fact finding and credibility of witnesses determinations]; see also People v. Adcox (1988) 47 Cal.3d 207, 253, 253 Cal.Rptr. 55, 763 P.2d 906 [jury presumed to have followed the court's instructions].)
In any event, the trial court acknowledged that the juror's perception that defense *388 witnesses were not well treated and that the detective was untruthful in his interrogation of appellant did not demonstrate an inability to be fair and impartial. The grounds for discharging the juror were the court's concern about her psychological state and mental acuity in view of her "body language," her misuse of the word "violence," and her perception or misperception of the judge's facial expressions.
Although the ultimate decision whether to retain or discharge a juror is subject to the sound discretion of the trial court, that discretion "is `bridled to the extent' the juror's inability to perform his or her functions must appear in the record as a `demonstrable reality,' and `court[s] must not presume the worst' of a juror." (People v. Bowers (2001) 87 Cal.App.4th 722, 729, 104 Cal.Rptr.2d 726.) Here, it is undisputed that Juror No. 8 was agitated and upset during questioning, but the record does not support the court's presumption that Juror No. 8's emotional state rendered her unable to carry out her duties as a juror. The court did not ask Juror No. 8 the reason behind her observed agitation which could easily have been due to being isolated from the panel and subjected to questioning by the court and counsel. The record is clear that despite her agitation, Juror No. 8 responded rationally to the questions and expressed an unequivocal desire to remain on the jury, repeatedly indicating that she was able to put aside her concerns and compose herself sufficiently to proceed with the trial.[7]
The trial court also sought to base the discharge on Juror No. 8's misuse of the word "violence" in reference to the interrogation of appellant by Detective Romero. Although the juror, under the stress of the moment, misused the word, the record also does not support an inference that she was either irrational or so ignorant of the English language as to be incapable of understanding and following the court's instructions or communicating with her fellow jurors. Her inaccurate usage suggests a lack of eloquence under pressure but it does not demonstrate lack of a sufficient command of English to apply the court's instructions and to participate meaningfully in deliberations. (See People v. Elam (2001) 91 Cal.App.4th 298, 316, 110 Cal. Rptr.2d 185 [court held that existence of "[s]ome language difficulty is insufficient [ground for discharge of juror]. If, with repeated explanations and discussions, [juror in question] could comprehend matters, then it is immaterial that he had a pronounced accent, his English was not the best and juror communication was not quick and easy"].)
Where a charge of misconduct or inability to perform is made against a juror, the court must conduct "an inquiry sufficient to determine the facts." (People v. Burgener (1986) 41 Cal.3d 505, 519, 224 Cal.Rptr. 112, 714 P.2d 1251, overruled on another ground in People v. Reyes (1998) 19 Cal.4th 743, 80 Cal.Rptr.2d 734, 968 P.2d 445.) In People v. Castorena (1996) 47 Cal.App.4th 1051, 1066, 55 Cal.Rptr.2d 151, this court held that the failure to conduct an adequate inquiry into allegations of juror misconduct was prejudicial where the trial court "did not have the requisite facts upon which to decide whether [the discharged juror] in fact failed to carry out her duty as a juror to deliberate or whether the jury's inability to reach a verdict was due, instead, simply to [the juror's] legitimate disagreement with the other jurors." Similarly, in People v. Delamora *389 (1996) 48 Cal.App.4th 1850, 56 Cal. Rptr.2d 382, where two jurors were dismissed immediately upon asking for the court's assistance in obtaining pay from their employers for an extra day of service, the court said: "[T]he trial court's determination that good cause exists to discharge a juror must be supported by substantial evidence [citation] and where, as here, there is no evidence at all to show good cause (because no inquiry of any kind was made), the procedure used was by definition inadequate." (Id. at p. 1856, 56 Cal.Rptr.2d 382.)
The court's inquiry here must likewise be deemed inadequate. The purported bases for the court's removal of Juror No. 8 was concern about her mental acuity, use of language, and emotional ability to continue as a juror. But not a single question was asked of the juror about these topics. Rather than conducting an inquiry to ascertain whether Juror No. 8 was too upset to go on or whether aggressive cross-examination of appellant such as the prosecutor proposed would render her incapable of acting as a fair and impartial juror, the court simply assumed that would be the case due to its reading of her "body language" during the discussion of other subjects. Likewise, instead of attempting to ascertain the limits of the juror's language abilities, the court assumed that misuse of a single word rendered her incapable of performing the functions of a juror. The result of this lack of inquiry was a dearth of objective evidence to support the court's findings. Upholding the discharge of a juror in the middle of trial under these circumstances, where the sole support is the court's and the prosecutor's subjective belief that the juror is unable to go on, would place unbridled discretion in the court's hands and compromise a defendant's fundamental constitutional right to trial by jury. We conclude that the trial court abused its discretion in discharging the juror.

II
The next issue is whether removal of Juror No. 8 was prejudicial to the defense. On this point, we are bound by a decision of our Supreme Court in a case which is directly analogous to the one before us. In People v. Hamilton (1963) 60 Cal.2d 105, 32 Cal.Rptr. 4, 383 P.2d 412, overruled in part in People v. Morse, supra, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33, a juror, during the penalty phase of the trial in which the defendant had been convicted of first degree murder, asked several questions concerning the circumstances under which a prisoner serving a life sentence could be released. She further revealed that she had attempted to read the entire Penal Code during the trial, but that she would accept the law as explained by the court. The trial court ordered her discharged and replaced by an alternate. The appellate court concluded that the discharge was without good cause: "It cannot be said that because a juror has read a code, become confused thereby, requested the court to explain the law to her, stated that she will accept the explanation as given to her by the court, and will not communicate what she has read to the other jurors, she has shown any inability to perform her duty as a juror." (Id. at p. 127, 32 Cal.Rptr. 4, 383 P.2d 412.)
The People cited authority for the proposition that an irregularity in the discharge of a juror and substitution of an alternate was nonprejudicial error. The appellate court disagreed. In one case cited by the People, People v. Howard (1930) 211 Cal. 322, 295 P. 333, disapproved in part in People v. Thomas (1945) 25 Cal.2d 880, 156 P.2d 7, "the discharged juror had expressed a prejudice against two defense witnesses" and thus "the substitution of an *390 alternate in his place was favorable to the defense." (People v. Hamilton, supra, 60 Cal.2d at p. 127, 32 Cal.Rptr. 4, 383 P.2d 412.) In the other, People v. Abbott (1956) 47 Cal.2d 362, 303 P.2d 730, "the juror was discharged because he worked in the same office as defendant's brother, although he did not know that individual by sight before he was pointed out at the trial" and "[t]here was no showing that the juror would have been more favorable to one side or the other." (Hamilton, at p. 127, 32 Cal.Rptr. 4, 383 P.2d 412.) The case before it "present[ed] an entirely different situation." (Ibid.) "Here, the prosecution moved for the substitution of the alternate for [the discharged juror] on the stated ground that she `had disclosed her opposition to a verdict imposing the death penalty.' Thus, her disqualification could only be beneficial to the prosecution and prejudicial to the defense." (Id. at pp. 127-128, 32 Cal.Rptr. 4, 383 P.2d 412.)
The court went on to explain: "While it has been said repeatedly, in the cases cited above, that a defendant is not entitled to be tried by a jury composed of any particular individuals, but only by a jury composed of qualified and impartial jurors, this does not mean that either side is entitled to have removed from the panel any qualified and acting juror who, by some act or remark made during the trial, has given the impression that he favors one side or the other. It is obvious that it would be error to discharge a juror for such a reason, and that, if the record shows (as it does here), that, based on the evidence, that juror was inclined toward one side, the error in removing such a juror would be prejudicial to that side. If it were not, the court could `load' the jury one way or the other. That is precisely what occurred here. The juror asked, in good faith and in order to be instructed by the court, questions which indicated that (temporarily at least) she was considering the probability of a life sentence. To dismiss her without proper, or any, cause was tantamount to `loading' the jury with those who might favor the death penalty. Such, obviously, was prejudicial to appellant." (People v. Hamilton, supra, 60 Cal.2d at p. 128, 32 Cal.Rptr. 4, 383 P.2d 412.)
The same is true here. Shortly before the close of evidence, Juror No. 8 asked in good faith for an explanation of behavior she thought she had noticed during trial and testimony which caused her to be concerned about police techniques. Her remarks created the impression that she might have been, at least for the moment, sympathetic to the defense. Nevertheless, she stated she had not formed an opinion about the outcome and vowed to keep an open mind. The prosecutor, at the trial court's invitation, immediately sought discharge on less than compelling grounds. The court granted the prosecution's request without adequately exploring whether the juror's emotional state rendered her unfit for duty. Although the court may well have been sincerely motivated by concerns about Juror No. 8's ability to continue to function in her role as a juror, the result was the loss of a juror who seemed inclined to give serious consideration to the testimony of the defense witnesses. "Such, obviously, was prejudicial to appellant." (People v. Hamilton, supra, 60 Cal.2d at p. 128, 32 Cal.Rptr. 4, 383 P.2d 412.)

III
We now turn to a more significant issue raised by appellant's brief. Appellant contends that excusing a juror without cause over defense objection is "tantamount to a mistrial without necessity" and precludes retrial due to the federal and California constitutional prohibitions on double jeopardy. *391 To understand this contention, some background is necessary.

A
The double jeopardy clause of the Fifth Amendment provides: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." The California Constitution similarly provides: "Persons may not be put in jeopardy for the same offense." (Cal. Const., art. I, § 15.) "The right not to be placed twice in jeopardy for the same offense is as sacred as the right to trial by jury." (Larios v. Superior Court (1979) 24 Cal.3d 324, 329, 155 Cal.Rptr. 374, 594 P.2d 491.) "Without the guarantee against double jeopardy, the chances of convicting innocent persons would be increased, both because the state would have unlimited opportunities to prosecute an acquitted defendant and because the exposure of the accused's defense in the first trial would provide the state with a major advantage in preparing for the second." (Ibid.)
The guarantee against double jeopardy is "derived from English common law, which followed then, as it does now, the relatively simple rule that a defendant has been put in jeopardy only when there has been a conviction or an acquittalafter a complete trial." (Crist v. Bretz, supra, 437 U.S. 28, 33, 98 S.Ct. 2156, 57 L.Ed.2d 24, fns. omitted.) Beginning with the United States Supreme Court's decision in United States v. Perez (1824) 9 Wheat. 579, 6 L.Ed. 165, however, "it became firmly established . . . that a defendant could be put in jeopardy even in a prosecution that did not culminate in a conviction or an acquittal, and this concept has been long established as an integral part of double jeopardy jurisprudence. Thus in Wade v. Hunter [(1949)] 336 U.S. 684, 688 [69 S.Ct. 834, 93 L.Ed. 974], the Court was able accurately to say: `Past cases have decided that a defendant, put to trial before a jury, may be subjected to the kind of "jeopardy" that bars a second trial for the same offense even though his trial is discontinued without a verdict.'" (Crist v. Bretz, supra, 437 U.S. at pp. 34-35, 98 S.Ct. 2156.)
In Crist v. Bretz, the court confirmed the rule "that jeopardy attaches when the jury is empanelled and sworn" and made clear that the rule was constitutional in scope and applicable to the states through the Fourteenth Amendment.[8] (437 U.S. at pp. 35, 37-38, 98 S.Ct. 2156.) "The reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a chosen jury. That interest was described . . . as a defendant's `valued right to have his trial completed by a particular tribunal.' [Citation.] It is an interest with roots deep in the historic development of trial by jury in the Anglo American system of criminal justice. Throughout that history there ran a strong tradition that once banded together a jury should not be discharged until it had completed its solemn task of announcing a verdict. [¶] Regardless of its historic origin, however, the defendant's `valued right to have his trial completed by a particular tribunal' is now within the protection of the constitutional guarantee against double jeopardy, since it is that `right' that lies at the foundation of the federal rule that jeopardy attaches when *392 the jury is empaneled and sworn." (Id. at pp. 35-36, 98 S.Ct. 2156, fns. omitted.)
The court in Crist also confirmed the existence of an important exception to the bar against retrial of a criminal defendant: "In the [United States v.] Perez case, [supra, 9 Wheat. 579, 6 L.Ed. 165,] the trial judge had discharged a deadlocked jury, and the defendant argued in this Court that the discharge was bar to a second trial. The case has long been understood as standing for the proposition that jeopardy attached during the first trial, but that despite the former jeopardy a second trial was not barred by the Double Jeopardy Clause because there was a `manifest necessity' for the discharge of the first jury." (Crist v. Bretz, supra, 437 U.S. at p. 34, fn. 10, 98 S.Ct. 2156, italics added; accord, Doumum v. United States (1963) 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 ["At times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interestwhen there is an imperious necessity to do so"].)
The holding in Crist v. Bretz created no restructuring of California law, since our courts had long held that jeopardy attached once the jury was empaneled and sworn. (See, e.g., Jackson v. Superior Court (1937) 10 Cal.2d 350, 352, 74 P.2d 243["This question as to when jeopardy attaches to a defendant placed on trial in a criminal action is settled in so far as the courts of this state have spoken by the authorities cited in the opinion of the District Court of Appeal hereinafter set forth. These authorities hold that a jury stands charged with the deliverance of a defendant when its members have been impaneled and sworn"]; Cardenas v. Superior Court (1961) 56 Cal.2d 273, 275, 14 Cal. Rptr. 657, 363 P.2d 889.)
In Paulson v. Superior Court (1962) 58 Cal.2d 1, 22 Cal.Rptr. 649, 372 P.2d 641, for example, after a few hours of deliberations, the foreman indicated that the jurors had some questions. In the course of answering the questions, the trial court became aware of where the jury stood numerically and sua sponte declared a mistrial based on deadlock. No juror had expressed the opinion on the record[9] that the panel would be unable to reach an agreement on a verdict. The appellate court agreed that double jeopardy barred a retrial because of the lack of necessity for the jury's discharge: "`Once the jury is impaneled and sworn, the defendant is in jeopardy. He cannot be deprived of any benefit to be derived from that jeopardy and is entitled to have the jury render a verdict, when, as in this case, he has not consented to the discharge of the jury and there is no legal necessity for such discharge.' " (Id. at p. 9, 22 Cal.Rptr. 649, 372 P.2d 641.)
Similarly, in Curry v. Superior Court, supra, 2 Cal.3d 707, 87 Cal.Rptr. 361, 470 P.2d 345, the trial court declared a mistrial sua sponte, expressing concern about several statements which came in during the testimony of the chief prosecution witness. Defendants immediately entered a plea of once in jeopardy. The appellate court agreed with defendants that retrial was impermissible: "Implementing [the California] constitutional command [against double jeopardy], the decisions of this court have settled the now *393 familiar rules that (1) jeopardy attaches when a defendant is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly impaneled and sworn, and (2) a discharge of that jury without a verdict is equivalent in law to an acquittal and bars a retrial, unless the defendant consented thereto or legal necessity required it. [Citations.]" (Id. at pp. 712-713, 87 Cal.Rptr. 361, 470 P.2d 345.)
Quoting a well-known passage from the United States Supreme Court's opinion in Green v. United States (1957) 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199, the court explained why the prohibition was essential to our system of jurisprudence: "`The underlying idea [of the protection against double jeopardy], one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.'" (Curry v. Superior Court, supra, 2 Cal.3d at p. 717, 87 Cal.Rptr. 361, 470 P.2d 345, quoting Green v. United States, supra, 355 U.S. at pp. 187-188, 78 S.Ct. 221.)
As can be seen from the above authorities, California courts had further long agreed with the proposition discussed in Crist and derived from United States v. Perez, that declaration of mistrial and discharge of a jury prior to verdict does not lead to double jeopardy where some type of "necessity"referred to as "manifest necessity" in Perez and "legal necessity" in the California casesrequired it. Jeopardy applied to bar retrial in Curry and Paulson because in neither case, could the appellate courts discern a "legal necessity" for the trial court's action in declaring mistrial. In Curry, where the mistrial was based on introduction of improper testimony, the appellate court explained: "[T]here was no `legal necessity'as that concept has been limited in our decisionsfor the court to declare a mistrial and discharge the jury without petitioners' consent. In California, legal necessity for a mistrial typically arises from an inability of the jury to agree [citations] or from physical causes beyond the control of the court [citations], such as the death, illness, or absence of judge or juror [citations] or of the defendant [citations]. A mere error of law or procedure, however, does not constitute legal necessity." (Curry v. Superior Court, supra, 2 Cal.3d at pp. 713-714, 87 Cal.Rptr. 361, 470 P.2d 345.)
In Paulson, the trial court attempted to justify its order on an established basis for a finding of legal necessitythe inability of the jury to agree. The facts established, however, that the jury was discharged "after deliberating less than five hours"; that "[although they returned to the courtroom to have four questions answered, they were given no opportunity to consider the judge's answers during further deliberations"; and that "[n]o juror ever stated in open court that he thought the jury could not reach an agreement." (Paulson v. Superior Court, supra, 58 Cal.2d at p. 7, 22 Cal.Rptr. 649, 372 P.2d 641.) On those facts, the evidence did not support the trial court's finding, and the appellate court held that legal necessity did not exist because the trial court had abused its discretion in concluding that the jury was hopelessly deadlocked.

B
As can be seen from the above cited authorities, there is no question that once a jury is empaneled and jeopardy *394 attaches, declaration of mistrial over defense objection without legal necessity and the subsequent discharge of the entire juryresults in the creation of an insurmountable constitutional bar to retrial. We believe it necessarily follows that reconstituting a jury by discharging one or more of its members over defense objection without proper justification must lead to the same result, particularly where, as here, the discharge resulted in a jury less favorable to the defendant.
Our analysis of the issue begins with the early cases in which the constitutionality of section 1089 was decided. Although the practice of substituting an alternate juror in the place of an original juror who can no longer serve may seem commonplace today, at one time there was grave concern that it might interfere with the accused's right to trial by jury and right to be free from double jeopardy. (See Annot., Constitutionality and Construction of Statute or Court Rule Relating to Alternate or Additional Jurors or Substitution of Jurors During Trial (1962) 84 A.L.R.2d 1288, and cases cited therein.)
The now-routine practice of selecting alternate jurors at the beginning of trial to serve as potential replacements for the original twelve commenced in this state with the enactment of section 1089 in 1895. The statute went through various incarnations over the years, but always focused on the need for a finding of good cause and manifest inability to perform the functions of a juror before a sworn juror could be discharged. "As originally enacted in 1895, Penal Code section 1089 permitted the discharge of a juror and the substitution of an alternate juror only `before the final submission of the case' and only if `a juror die[s], or become[s] ill, so as to be unable to perform his duty.' (Stats.1895, ch. 213, § 1, p. 279.) In 1933 the statute was amended to permit substitution of an alternate juror `at any time, whether before or after the final submission of the case to the jury,' and expanded the basis for doing so to include `if a juror requests a discharge and good cause appears therefor.' (Stats.1933, ch. 521, § 1, pp. 1342-1343.) In 1949, the statute again was amended to permit discharge if `upon other good cause shown to the court [the juror] is found to be unable to perform his duty.' (Stats.1949, ch. 1312, § 1, p. 2300.)" (People v. Williams, supra, 25 Cal.4th at p. 448, fn. 4, 106 Cal.Rptr.2d 295, 21 P.3d 1209.)
Prior to the adoption of section 1089 in 1895, "it was necessary to declare a mistrial in the event that a juror became incapacitated or disqualified...." (People v. Hamilton, supra, 60 Cal.2d at p. 125, 32 Cal.Rptr. 4, 383 P.2d 412, citing People v. Peete (1921) 54 Cal.App. 333, 365, 202 P. 51.) The court in People v. Peete appears to have been the first California case to evaluate whether a defendant's conviction by a jury composed of 11 original jurors and one alternate violated his constitutional right to trial by jury. The alternate was substituted "in strict accord with the provisions of section 1089" during trial when an original juror became too ill to continue. (Peete, at p. 363, 202 P. 51.) The defendant claimed that the statute was unconstitutional because it "deprives a defendant of his right to a trial by jury as known to the common law." (Ibid.)
The appellate court acknowledged that "[t]he provision of our Bill of Rights that the right of trial by jury is to remain inviolate means that all the substantial incidents and consequences which pertain to the right of trial by jury at common law are beyond the reach of hostile legislation and are preserved in their ancient, substantial extent as they existed at common law" (People v. Peete, supra, 54 Cal.App. at pp. 363-364, 202 P. 51) and that "[a]t *395 common law, according to the established precedents, where a juror has become incapacitated by illness or death after the jury is impaneled and sworn in chief, the proper procedure appears to have been to discharge the entire panel and begin de novo by forming a new jury" (id. at p. 365, 202 P. 51). Nonetheless, the court concluded that Penal Code section 1089 did not impinge on any of the substantial incidents and consequences pertaining to the common law right to trial by jury: number, impartiality, and unanimity. Since the verdicts was rendered by the unanimous vote of 12 persons, all of whom heard the witnesses' testimony, received the court's instructions, and acted under the obligation "well and truly to try the matter in issue," there was no interference with the right to a jury of 12 or a unanimous verdict. As far as impartiality was concerned, "[e]very safeguard that the law has thrown around the regular jurors to insure an impartial verdict, even to the extent of being kept in the custody of the sheriff during the trial, the alternate juror is surrounded with from the commencement to the end of the trial." (Peete, at p. 367, 202 P. 51.) "These three essentials being completely secured and adequately guarded by suitable legislation, the right of trial by jury will remain `inviolate.'" (Id. at p. 366, 202 P. 51.)
Section 1089 was also subjected to double jeopardy challenge, defendants arguing that their fate was put in the hands of a second jury whenever an alternate was substituted for an original juror. Numerous courts have held that substitution of alternate jurors raises no constitutional issues as long as it is done in precise accordance with section 1089. In People v. Hess (1951) 104 Cal.App.2d 642, 234 P.2d 65, for example, after the jury had been deliberating two days, a juror asked to be excused because her father had a stroke. The juror was excused over defense objection and an alternate was put in her place. The court held: "When the substitution of the alternate juror for one of the regular jurors is in accordance with the provisions of Penal Code, section 1089, no question of double jeopardy would arise." (People v. Hess, supra, at p. 680, 234 P.2d 65; accord, In re Mendes (1979) 23 Cal.3d 847, 853, 153 Cal.Rptr. 831, 592 P.2d 318 ["`If the substitution of the alternate for one of the regular jurors is in accordance with the provisions of Penal Code, section 1089 no question of double jeopardy would arise'"]; People v. Hess (1951) 107 Cal. App.2d 407, 425-426, 237 P.2d 568 ["If, as we have held, the selection of the alternate jurors and the excusing of [the original juror] were substantially in accordance with the provisions of section 1089 of the Penal Code, it necessarily follows that jeopardy did not attach until after the alternate jurors were sworn and therefore, appellants faced but one jury"].)
The issue of section 1089's constitutionality was addressed by our Supreme Court as recently as 1976 in People v. Collins (1976) 17 Cal.3d 687,131 Cal.Rptr. 782, 552 P.2d 742. During proceedings in the trial court, a juror had asked to be excused after deliberations began, announcing she had became upset and emotionally involved with the case and would not be able to make a decision based on the evidence and the law. The trial court discharged her over defendant's objection and substituted an alternate juror. The appellate court addressed the specific question of "whether the substitution of an alternate for an original juror is constitutionally permissible after deliberations have begun." (Id at p. 691, 131 Cal.Rptr. 782, 552 P.2d 742.) Although the court agreed that "[t]he right [to trial by jury] is guaranteed as it existed at common law at the time the state Constitution was adopted and may not be abridged by act of the Legislature," it *396 believed that the Legislature had the power to "establish reasonable regulation or conditions on the enjoyment of the right as long as the essential elements of trial by jury are preserved." (Id. at pp. 692-693, 131 Cal.Rptr. 782, 552 P.2d 742.) The essential elements are preserved despite the substitution of an alternate during deliberations, the court held, as long as "good cause has been shown and the jury has been instructed to begin deliberations anew." (Id. at p. 691, 131 Cal.Rptr. 782, 552 P.2d 742.)
In so holding, the court rejected defendants' contention that "a mistrial must be declared when a juror is dismissed for good cause after deliberations have begun." (People v. Collins, supra, 17 Cal.3d at p. 693, 131 Cal.Rptr. 782, 552 P.2d 742.) "[T]he right to trial by jury does not require a declaration of a mistrial when a properly qualified alternate juror is available and that juror fully participates in all of the deliberations which lead to a verdict." (Ibid.) The court also rejected defendant's contention that good cause for dismissal of the original juror was not shown. "The extensive hearing in which the juror steadfastly maintained that she could not follow the court's instructions, that she had been upset throughout the trial and that she wanted to be excused, clearly justified a conclusion that she could not perform her duty and thus established good cause for her discharge." (Id. at p. 696, 131 Cal.Rptr. 782, 552 P.2d 742.) As a result of its conclusion that good cause existed, the court did not address "[defendant's contention that he was placed twice in jeopardy by the substitution of an alternate juror without legal necessity or his consent.... The discharge of the juror for good cause amounted to a legal necessity." (Id. at pp. 696-697, 131 Cal.Rptr. 782, 552 P.2d 742.)
As far we can ascertain, the issue which the Supreme Court declined to address in Collinsthe impact of the improper discharge of a single juror without good cause or legal necessity over defense objection has been, squarely faced by only two courts of appeal in California: People v. Young (1929) 100 Cal.App. 18, 279 P. 824, and People v. Burgess (1988) 206 Cal. App.3d 762, 253 Cal.Rptr. 828.[10]
*397 In Young, after the jurors and alternates had been selected and sworn, one of the regular jurors realized that he was socially acquainted with a prospective defense witness. The prosecutor sought permission to exercise a peremptory challenge. The trial court permitted the challenge over defense objection. A replacement juror was selected from the venire. The defense immediately entered a plea of once in jeopardy. On appeal, the court concluded that the plea should have been accepted.
The court relied in part on the reasoning of an earlier case, People v. Schmitz (1908) 7 Cal.App. 330, 94 P. 407, in which a juror had been improperly peremptorily challenged by the prosecutor after being sworn. The court in Young cited Schmitz for certain fundamental propositions which are no less valid today, nearly 100 years later: "`The Code . . . intended that after a juror has been examined, passed, and has taken a solemn oath to try the case he could not then except for a valid reason, be, at the caprice of the parties, discharged. He became a juror in that case, and thus a part of the machinery of the court. He became a part of the tribunal for the purpose of determining the guilt or innocence of the defendant. That tribunal was changed without the consent of the defendant, and in the interest of his adversary.' " (People v. Young, supra, 100 Cal. App. at pp. 21-22, 279 P. 824, quoting People v. Schmitz, supra, 7 Cal.App. at p. 347, 94 P. 407.) "`If this juror could thus be excused without cause, there is no reason why the same thing could not have been repeated as often as the district attorney might have requested it.... Defendant had the right to have the jury impaneled according to the law of the state under which he was being tried. The prosecution did not have the right to arbitrarily dismiss qualified jurors unless it could be done as provided by the Code.... [¶] The Code provisions in regard to the impanelment of jurors and their qualifications have in view the right of the defendant to a fair and impartial jury, and one not picked and selected by the prosecution.' " (Young, at pp. 22-23, 279 P. 824, quoting Schmitz, at pp. 350-351, 94 P. 407.)
The court in Young went on to reach the "unavoidable" conclusion that in the case before it, "error of a serious nature and affecting the substantial rights of the defendant was committed by the sustaining of the peremptory challenge." (100 Cal.App. at p. 23, 279 P. 824.) "It is equally clear that the jury having been completed and regularly impaneled and sworn before the peremptory challenge was allowed, this appealing defendant was in jeopardy. Jeopardy signifies the danger of conviction and punishment which one charged with a criminal offense incurs when duly put upon trial before a court of competent jurisdiction, and a jury has been charged with his deliverance. [Citation.] A jury stands so charged when its members have been impaneled and sworn. [Citation.] His jeopardy is real and he cannot be again subjected to jeopardy unless the jury be discharged without rendering a verdict, by his consent, or upon some legal necessity resulting from physical causes beyond the control of the court. [Citation.] If deprived of a verdict because an error of law would result in a mistrial, except as provided by statute therefor, the discharge is equivalent to an acquittal and is a bar to a subsequent trial." (Id. at pp. 23-24, 279 P. 824, italics added.)
The court in Burgess rejected Young and reached the opposite result. In Burgess, immediately after the jury and alternates were sworn, a juror informed the court that she and her husband were pursing a lawsuit against the local planning department over the proposed development *398 of some land. On further examination, she indicated she would have difficulty in being fair and impartial if the planning department were involved in the trial (it was not), but that her feelings did not extend to the district attorney's office, the sheriffs department, or any other law enforcement agency. The same juror's husband had told the prosecutor that he looked like the same one who had prosecuted the husband seven years earlier in a minor matter. The prosecutor had no recollection of that having occurred. On these facts, the trial court found that no cause for dismissal had been established. Instead, it purported to reopen jury selection to permit each party to exercise a peremptory challenge. The prosecutor used the opportunity to excuse the juror and an alternate was seated in her place.
On appeal, the defendant in Burgess presented the argument that he had been forced to face two juries in violation of his constitutional right against double jeopardy: "[T]he first, which was empaneled and sworn before the trial court reopened jury selection, and the second, consisting of eleven of the original jurors plus the alternate." (People v. Burgess, supra, 206 Cal. App.3d at pp. 765-766, 253 Cal.Rptr. 828.) Preliminarily, the appellate court made clear that it considered itself bound by the trial court's finding of no good cause for discharge. It was clear, therefore, that the juror had not been properly excused under section 1089 as in People v. Collins, supra, 17 Cal.3d 687, 131 Cal.Rptr. 782, 552 P.2d 742 and other similar cases. The court was thus compelled to analyze whether double jeopardy applied.
The court purported to resolve the issue by reference to the policy reasons underlying the protections offered by the jeopardy clause. The court stated that "[t]he jeopardy clause has been interpreted as affording three basic protections or guarantees: `It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.' [Citations.] It also protects against retrial after the improper declaration of a mistrial." (206 Cal.App.3d at p. 767, 253 Cal.Rptr. 828.) It recited the basic policy underlying double jeopardy as outlined in Green v. United States, supra, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199, which, as we have seen, speaks to the necessity of preventing the State from using its power and resources to make repeated attempts to convict an individual, subjecting him to embarrassment, expense, and ordeal. With no other analysis, the court concluded: "When the improper juror substitution in the instant case is measured against constitutional protections and policies, it is readily apparent that no meaningful deprivation or violation of those protections or policies occurred. There was no former conviction or acquittal, and no unauthorized mistrial. Although the erroneous substitution of a regular juror with an alternate may be prejudicial under many circumstances, it is not the equivalent of mistrial." (People v. Burgess, supra, 206 Cal.3d at p. 768, 253 Cal.Rptr. 828.)
The analysis in Burgess is flawed. Since United States v. Perez was decided in 1824, American courts have not followed the English rule that a defendant has been put in jeopardy only when there has been a conviction or acquittal. (Crist v. Bretz, supra, 437 U.S. at pp. 34-35, 98 S.Ct. 2156.) From the time of that landmark decision, the double jeopardy issue faced by this country's courts has been a more complex one. (See United States v. Jorn (1971) 400 U.S. 470, 480, 91 S.Ct. 547, 27 L.Ed.2d 543 ["In dealing with [the question of when double jeopardy precludes retrial], this Court has, for the most part, *399 explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial"].) "Harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict are examples when jeopardy attaches. [Citation.] But those extreme cases do not mark the limits of the guarantee. The discretion to discharge the jury before it has reached a verdict is to be exercised `only in very extraordinary and striking circumstances,' [citation].... For the prohibition of the Double Jeopardy Clause is `not against being twice punished, but against being twice put in jeopardy.' [Citation.]" (Downum v. United States, supra, 372 U.S. at p. 736, 83 S.Ct. 1033.)
The determination of whether to preclude retrial in any given situation can be made only by focusing on all of the fundamental rights and policies upheld by the prohibition on double jeopardy, including the "need to protect the interest of an accused in retaining a chosen jury" (Crist v. Bretz, supra, 437 U.S. at p. 35, 98 S.Ct. 2156), the right to a fair and impartial jury rather than one selected by the prosecution (People v. Young, supra, 100 Cal.App. at p. 23, 279 P. 824), and the importance of avoiding trials in which undue advantage has been placed in the hands of the prosecution (Larios v. Superior Court, supra, 24 Cal.3d at p. 329, 155 Cal.Rptr. 374, 594 P.2d 491; Downum v. United States, supra, 372 U.S. at p. 736, 83 S.Ct. 1033.).
Applying these policies to the present case, leads us to the conclusion that jeopardy bars retrial when, without legal necessity or good cause, the court alters the composition of the jury in the middle of trial in a way that favors the prosecution. In the case before us, a fair and impartial jury was selected, sworn, and stood ready to perform its duty. Trial was almost complete and the jurors, having heard and considered nearly all of the evidence, would naturally have begun the process of favoring one side or another in their private thoughts. At that point, one of the jurors spoke out about some concerns, evincing sympathy for a defense witness and, by implication, for the appellant himself. Nothing said by the juror indicated an inability to be impartial or follow the law or otherwise established good cause for discharge under section 1089. At the trial court's invitation, the prosecutor requested the juror's discharge "for cause" and succeeded in having her replaced by an alternate. The court and the prosecutor may have sincerely believed that the juror was emotionally unable to continue. Unfortunately, the scanty record before us raises an opposing inference just as strong that the motivation was to replace a fully qualified juror in order to avoid a hung jury and painful retrial. One may be sympathetic to that motivation. But were we to conclude that retrial is permitted under these circumstances, the vital and fundamental right of every citizen to trial by a fair and impartial jury would be gravely undermined and the right to be free from double jeopardy would be rendered meaningless.
We must presume that experienced counsel and judges become adept at reading the words, facial expressions, and body language of jurors and determining which of them might be inclining toward the defense particularly where, as here, the demeanor of the jurors and the alternates has been observed as they take in the evidence over the course of many days. At that point, the temptation to tinker with the makeup of the jury to ensure the conviction of a one who appears to be an *400 obvious wrongdoer could arise. If the result of discharging a juror sympathetic to the defense without good cause was nothing more than a reversal of the conviction and remand for retrial minus the offending juror, we fear such discharges could become routine.[11] This would do lasting harm to the fundamental rights protected by the right to trial by an impartial jury and the prohibition against double jeopardy.

DISPOSITION
The judgment is reversed.
We concur: CHARLES S. VOGEL, P.J., and EPSTEIN, J.
NOTES
[1] Appellant was charged and ultimately convicted under Penal Code sections 288, subdivisions (a) and (c)(1), 288a, subdivision (b)(2), and 289, subdivision (i).
[2] As will be seen, the juror was referring to untruths apparently told to the appellant during the police interview.
[3] We presume the court meant the prosecuting attorney.
[4] The following exchange took place:

"THE COURT: [Y]ou believe Detective Romero has lied in his testimony: is that correct?
"JUROR NUMBER 8: No. I was saying that so much of his testimony was that he was untruthful during the interrogation; that I have difficulty differentiating between that kind of violence and other violence.
"THE COURT: I'm sorry. What do you mean Violence'?
"JUROR NUMBER 8: I don't know if that's normal practice, procedure.
"THE COURT: To confront a defendant with false evidence; is that correct?
"JUROR NUMBER 8: Yes. During an interrogation and if you're going to advise the jury about that. I didn't know. It caused me to be very disappointed in the way our country operates. I thought that kind of thing only happened in third-world countries."
[5] Appellant's attorney noted that the prosecutor had suggested during cross-examination that Wilfredo was "bumming" off his relatives. The record reflects the court sustained an argumentative objection to the question, and the prosecutor apologized, saying she had "slipped."
[6] Although the court and counsel referred to "challenge for cause," since the time for challenge was long past (see Code Civ. Proc., §§ 225, 226), we presume the intention was to invoke Penal Code section 1089 (hereafter section 1089) which, as will be discussed in greater detail, permits discharge of a juror for good cause after he or she has been empaneled and sworn. (See also Code Civ. Proc, § 233.)
[7] In fact, as we have seen, she became indignant when the court announced its intent to remove her as a juror and stated that had she known this would be the result of her coming forward, she would have raised her concerns afterwards in a letter rather than during trial.
[8] The court had held in a previous decision. Benton v. Maryland (1969) 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707, that the double jeopardy prohibition found in the United States Constitution was applicable to the states through the Fourteenth Amendment but had not specified until Crist that the federal rule governing when jeopardy attaches was also of constitutional stature.
[9] Apparently, the foreman had indicated to the bailiff off the record that the jury was hopelessly deadlocked and the bailiff reported the statement to the judge when counsel was not present and court was not in session. (Paulson v. Superior Court, supra, 58 Cal.2d at p. 5, 22 Cal.Rptr. 649, 372 P.2d 641.) The appellate court did not accept those statements as a legitimate part of the record.
[10] Other courts addressed the issue only in dicta. In People v. Howard, supra, 211 Cal. 322, 295 P. 333, a juror informed the court during closing argument that she personally knew two defense witnesses and was prejudiced against them and their testimony. "[D]efense counsel suggested a stipulation excusing the juror and selecting in her stead one of the alternates.... A stipulation to this effect was entered into in open court by the respective counsel...." (Id. at p. 324, 295 P. 333.) On appeal, the defendant argued that the substitution amounted to reversible error. Rather than reject the contention based on the trial stipulation (see People v. Seaton (2001) 26 Cal.4th 598, 639, 110 Cal.Rptr.2d 441, 28 P.3d 175), the court analyzed whether there was any invasion of the common law right of jury trial. Recognizing that "the circumstances of this case are not such as to bring it within the purview of section 1089 of the Penal Code providing for alternate jurors," the court concluded there had not been an invasion of defendants rights because, among other things, "[i]t is not claimed that the verdict would have been any different had the alternate juror not participated in the deliberations of the jury." (Howard, at p. 325, 295 P. 333.) Assuming its discussion of section 1089 has precedential value, the lack of prejudice distinguishes Howard from the present case.

In People v. Burns (1948) 84 Cal.App.2d 18, 189 P.2d 868, 12 jurors were selected and sworn, and the court announced an intention to select alternates after recess. The court then learned that one of the jurors stood accused of hit and run driving. The court dismissed the juror over defense objection. The appellate court held that since jeopardy attaches only after alternate jurors are sworn, double jeopardy was not an issue even if the juror had been wrongly discharged. (Id. at p. 26, 189 P.2d 868.)
[11] In numerous recent cases, appellate courts have been compelled to reverse convictions because of the discharge of a juror without good cause. (See, e.g., People v. Cleveland, supra, 25 Cal.4th at p. 486, 106 Cal.Rptr.2d 313, 21 P.3d 1225; People v. Bowers, supra, 87 Cal.App.4th at pp. 735-736, 104 Cal. Rptr.2d 726; People v. Delamora, supra, 48 Cal.App.4th at pp. 1855-1856, 56 Cal.Rptr.2d 382; People v. Castorena, supra, 47 Cal.App.4th at pp. 1066-1067, 55 Cal.Rptr.2d 151.) None of these cases discussed double jeopardy, apparently because the issue was not raised.